IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

TINA JIMERSON                                                    PLAINTIFF

JERELL THOMPSON, as
SPECIAL ADMINISTRATOR
of the estate of JOHN BROWN                    CONSOLIDATED PLAINTIFF

v.                         Case No. 4:20-cv-01145 KGB

DONNY FORD, former Sheriff of
Dallas County, Arkansas, *et al.*                          DEFENDANTS

DONNY FORD, former Sheriff of
Dallas County, Arkansas, *et al.*            CONSOLIDATED DEFENDANTS

## OPINION AND ORDER

Before the Court are the following motions for summary judgment:  separate defendants Ronnie Poole, the Estate of John Kellam, the Estate of Larry Case, and the City of Fordyce's (collectively "Fordyce Defendants") motion for summary judgment (Dkt. No. 184); separate defendants Donny Ford, individually and officially, and the Estate of William Setterman's (collectively "County Defendants") motion for summary judgment (Dkt. No. 189); and separate defendants the Estate of Jerry Bradshaw; Garland McAnally, former Arkansas State Police Investigator; and the Estate of George Godwin's (collectively "State Police Defendants") motion for summary judgment (Dkt. No. 192).

Separate plaintiff Jerell Thompson, as Special Administrator of the Estate of John Brown, and separate plaintiff Tina Jimerson (collectively "Plaintiffs") responded to the Fordyce Defendants, State Police Defendants, and County Defendants' motions for summary judgment (Dkt. No. 210).  State Police Defendants replied (Dkt. No. 222).

As an initial matter, Plaintiffs agree to dismiss their claims against Investigator John Kellam ("Investigator Kellam") and Sergeant Garland McAnnally ("Sergeant McAnally") (Dkt. No. 210, at 7 n.1–2). Therefore, the Court dismisses Plaintiffs' claims against Kellam and McAnally.

For the following reasons, the Court grants, in part, and denies, in part, the Fordyce Defendants, County Defendants, and State Police Defendants' motions for summary judgment (Dkt. Nos. 184; 189; 192).

## I.    Factual Background

As required by Federal Rule of Civil Procedure 56 and Local Rules 56.1 and 7.2, Fordyce Defendants, County Defendants, and State Police Defendants submitted statements of fact in support of their motions for summary judgment (Dkt. Nos. 185; 190; 193). Plaintiffs responded to defendants' statements of fact (Dkt. Nos. 205; 206; 207).[1]

Unless otherwise cited, the Court recounts the facts from the parties' statements of fact and the parties' responses to the statements of fact (Dkt. Nos. 185; 190; 193; 205; 206; 207).

### A.    Fordyce Defendants' Undisputed Facts

#### Background

On September 22, 1988, Myrtle Holmes was discovered to be the victim of a homicide at her residence, 301 West 8th Street, Fordyce, Arkansas (Dkt. No. 205, ¶ 1). On March 16, 1990, an Information for Capital Murder was filed in the Dallas County Circuit Court accusing Reginald Early, John Brown, Jr., and Charlie Vaughn of committing rape and robbery and causing the death

---

[1] Plaintiffs submitted a statement of disputed material facts in support of their response to defendants' motions for summary judgment (Dkt. No. 209). State Police Defendants submitted a response to Plaintiffs' statement of disputed material facts (Dkt. No. 221). The Court reviewed Plaintiffs' statement of material facts but did not consider them as undisputed for purposes of the summary judgment record.

of Holmes (*Id.*, ¶ 2).  On March 25, 1991, Vaughn pleaded guilty to the murder of Holmes and provided testimony implicating Early, Brown, and Jimerson in the crime (*Id.*, ¶ 3).  On March 27, 1991, an Information for Capital Murder was filed in the Dallas County Circuit Court accusing Jimerson of acting as an accomplice in Holmes' murder (*Id.*, ¶ 4).  The first criminal trial of Early, Brown, and Jimerson was held in April 1992 and resulted in a mistrial (*Id.*, ¶ 5).  On August 19, 1992, Early, Brown, and Jimerson were convicted of first-degree murder and aggravated robbery following a second jury trial and sentenced to life in prison (*Id.*, ¶ 6).  The Arkansas Supreme Court upheld the convictions of Early, Brown, and Jimerson after their appeals (*Id.*, ¶ 7).

### Arkansas State Police

The Arkansas State Police ("ASP") led the Holmes murder investigation (*Id.*, ¶ 8).  ASP maintained a file for the Holmes murder investigation, which contains photographs and documents ("ASP File 68-575-88") (*Id.*, ¶ 9).  The documents refer to video and audio recordings which are not contained in ASP File 68-575-88 (*Id.*).

ASP Criminal Investigation Division ("ASP CID") was responsible for maintaining Criminal Investigation Division ("CID") files (*Id.*, ¶ 10).  At the time of the Holmes investigation, reports were dictated, and the tape was sent to the Little Rock typing pool (*Id.*).  A copy of the transcribed report was then put in the CID file (*Id.*).

Lieutenant Jerry Bradshaw was company manager for ASP CID in south Arkansas at the time of the Holmes murder and had previously been an investigator (*Id.*, ¶ 11).  Lieutenant Bradshaw's area of responsibility included 11 counties, one of which was Dallas County (*Id.*).  Plaintiffs dispute that Lieutenant Bradshaw was no longer acting as an investigator (*Id.*).  Plaintiffs maintain that Lieutenant Bradshaw took numerous investigative steps during the Holmes investigation, including liaising with and supervising Private Investigator Earley ("Investigator

Earley"), meeting with confidential informants, interviewing Vaughn, reviewing tapes, interviewing Ronnie Prescott, and being present for the meeting with Charlie Vaughn, Bob Remitt, Vera Vughn, Ronnie Poole, and Don Ford (*Id.*).

Garland McAnally ("Sergeant McAnally") was a sergeant in ASP CID at the time of the Holmes murder and was responsible for Ashley, Bradley, Chicot, and Drew Counties (*Id.*, ¶ 12). George Godwin ("Investigator Godwin") was an investigator for ASP assigned to ASP CID shortly after the Holmes murder (*Id.*, ¶ 13). Lieutenant Bradshaw, Sergeant McAnally, and Investigator Godwin all participated in the Holmes murder investigation (*Id.*, ¶ 14). Lieutenant Bradshaw and Investigator Godwin are deceased (*Id.*, ¶ 15).

### Fordyce Police Department

Fordyce is located within Dallas County and had a population of approximately 5,000 in 1989 (*Id.*, ¶ 16). The Fordyce Police Department ("FPD") had primary responsibility for crimes committed within the City of Fordyce (*Id.*, ¶ 17). Ronnie Poole ("Chief Poole") had been the chief of police at FPD for less than one year at the time of the Holmes murder (*Id.*, ¶ 18). Chief Poole attended the Arkansas Law Enforcement Training Academy ("ALETA") (*Id.*, ¶ 19). Chief Poole completed training through the Arkansas Commission on Law Enforcement Standards, including "Basic Police Training" from October 10 to December 2, 1983 (*Id.*, ¶ 20). Chief Poole was issued a "Basic Certificate" on July 26, 1984, and a "General Certificate" on May 24, 1988 (*Id.*). John Kellam ("Investigator Kellam") was an investigator for FPD at the time of the Holmes murder (*Id.*, ¶ 21).

After October 1989, neither Chief Poole nor Investigator Kellam were employees of the City of Fordyce (*Id.*, ¶ 22). On approximately October 20, 1989, William R. Stage ("Chief Stage") became chief of police of FPD (*Id.*, ¶ 23). On February 13, 1990, Larry Case ("Investigator Case")

was approved by the Fordyce City Council to be hired as Chief Investigator of FPD Criminal Investigation Division ("FPD CID") (*Id.*, ¶ 24). Investigator Case testified that he worked for FPD for three or four months (*Id.*, ¶ 25). On March 22, 1990, Chief Stage and Investigator Case resigned from FPD (*Id.*, ¶ 26). Investigator Kellam and Investigator Case are deceased (*Id.*, ¶ 27).

### Michael Joe Earley

Investigator Earley was a licensed private investigator at the time of the Holmes murder (*Id.*, ¶ 28). Investigator Earley testified that he provided information to ASP and never provided information to FPD (*Id.*, ¶ 29). Investigator Earley stated that "when Myrtle Brown asked me if I'd work on this case, I said the only information I'd give out will be to Jerry Bradshaw or his–his officers with CID, nobody else." (*Id.*).

Investigator Earley testified regarding Chief Poole that "we didn't do anything together on this case." (*Id.*, ¶ 30). Chief Poole recalled that Investigator Earley discovered a key that fit Holmes' car, which Investigator Earley brought to Chief Poole (*Id.*). Investigator Earley said of Investigator Case that he "never saw him in action" and that he was not aware of anything that Investigator Case did in furtherance of the Holmes investigation (*Id.*, ¶ 31). Investigator Earley said regarding Investigator Kellam, he "didn't have any dealings with him." (*Id.*, ¶ 32). Investigator Earley was not an employee of Fordyce during the Holmes investigation (*Id.*, ¶ 33).

### Thirteenth Judicial District

The Thirteenth Judicial District includes Calhoun, Cleveland, Columbia, Dallas, Ouachita, and Union Counties (*Id.*, ¶ 34). Judge John Graves ("Judge Graves") was the circuit judge who handled all criminal matters throughout all six counties (*Id.*, ¶ 35). On January 1, 1989, Tom Wynne assumed office as prosecuting attorney for the Thirteenth Judicial District after being elected in 1988 (*Id.*, ¶ 36). He served in that role for 10 years (*Id.*). Prior to his election as

prosecuting attorney, Tom Wynne served as a deputy prosecutor for 12 years (*Id.*, ¶ 37). He was appointed as a deputy prosecutor in the Thirteenth Judicial District by his uncle, Frank Wynne (*Id.*). Robin Wynne, Tom Wynne's brother, was the deputy prosecutor responsible for Dallas, Calhoun, and Cleveland counties during Tom Wynne's tenure as prosecuting attorney (*Id.*, ¶ 38). Tom Wynne and Robin Wynne (collectively, "the Wynnes") maintained a private law practice (the "Wynne Law Firm") while working as prosecutors for the Thirteenth Judicial District (*Id.*, ¶ 39).

Marilyn Norman was employed as a secretary at the Wynne Law Firm from 1971 until 2020 (*Id.*, ¶ 40). She was a secretary for both prosecution and civil matters (*Id.*). The Wynne Law Firm maintained an office at 308 Main Street in Fordyce (*Id.*, ¶ 41).

Robin Wynne had separate files for each of the three counties that he was responsible for prosecuting, which were kept in the Wynne Law Firm office (*Id.*, ¶ 43). During Tom Wynne's term as prosecuting attorney, the prosecutors for the Thirteenth Judicial District observed an open-file policy and allowed defense attorneys to access their files (*Id.*, ¶ 44). Sometime after their term in office, the Wynnes moved their prosecutorial files from the Wynne Law Firm office to a storage facility that the Wynnes owned in Fordyce (*Id.*, ¶ 45). The Wynnes later disposed of the files at the direction of the active prosecuting attorney (*Id.*). Tom Wynne estimated that this occurred prior to 2011 (*Id.*). Robin Wynne is deceased (*Id.*, ¶ 46).

Fordyce Defendants assert that Tom Wynne acknowledged that Robin Wynne was best equipped to answer questions about the Holmes prosecution and added "Robin remembered things a lot better than – than I did. I had a tendency to try them and forget them." (*Id.*, ¶ 48).

David Butler was a deputy prosecutor and the prosecutor administrator who managed the Drug Task Force ("DTF") during Tom Wynne's tenure as prosecuting attorney (*Id.*, ¶ 51). Butler

is deceased (*Id.*, ¶ 52).  Gregg Parrish was a deputy prosecutor and prosecuted drug offenses throughout the Thirteenth Judicial District (*Id.*, ¶ 53).  Parrish was a junior deputy to Butler (*Id.*).

### Dallas County Sheriff's Office

Donny Ford ("Sheriff Ford") was elected Dallas County Sheriff in the November 1990 election (*Id.*, ¶ 54).  Sheriff Ford served as Sheriff for 24 years, beginning January 1, 1991 (*Id.*, ¶ 55).  Sheriff Ford did not recall working with either Investigator Case or Investigator Kellam (*Id.*, ¶ 56).

### Chief Poole's Employment

After Chief Poole left FPD, he became a patrol officer for the El Dorado Police Department ("EDPD") (*Id.*, ¶ 57).  He was employed at EDPD between September 16, 1989, and March 1, 1991 (*Id.*).  Chief Poole was assigned to DTF as an officer with EDPD after six months on patrol (*Id.*, ¶ 58).  Chief Poole transferred to the Dallas County Sheriff's Office but remained assigned to DTF (*Id.*, ¶ 59).  His dates of employment with the Dallas County Sheriff's Office are listed as February 19, 1991, to September 16, 1994 (*Id.*).  Chief Poole was not employed by the City of Fordyce while he was assigned to DTF (*Id.*, ¶ 60).

### Defense Attorneys

William Howard represented Early and Jimerson (*Id.*, ¶ 61).  Howard had not previously represented anyone in a murder case (*Id.*).  Robert Remet represented Vaughn (*Id.*, ¶ 62).  William Murphy represented Brown (*Id.*, ¶ 63).  Murphy asked Robert Jeffrey to join him in representing Brown, as Jeffrey had previously asked to "sit in with [Murphy] to gain experience." (*Id.*, ¶ 64).  Jeffrey had "probably been practicing for a year or two, and most of that was municipal court, which is traffic violations."  (*Id.*).  Murphy "directed and controlled the defense," and Jeffrey did not file any motions on his own prior to trial (*Id.*, ¶ 65).  Murphy surrendered his law license after

entering a guilty plea to suborning perjury in federal court in 1996 (*Id.*, ¶ 66).  Murphy has no recollection of Vaughn, the confession of a codefendant, or of any recanting witness at trial (*Id.*, ¶ 67).  Jeffrey is deceased (*Id.*, ¶ 68).

### Myrtle Holmes' Murder And Initial Law Enforcement Response

On September 22, 1988, Grady Brown and Glenn Sealfuth came to FPD at approximately 7:30 a.m. following an attempted wellness check on Holmes at her house, and they requested that Chief Poole go with them to Holmes' house on the south side of Fordyce (*Id.*, ¶ 69).  They found the house in disarray, with the bedroom ransacked, a large amount of blood, a broken knife blade, and a blood drag trail from the bedroom to a parked car (*Id.*, ¶ 70).  Chief Poole requested that Lieutenant Bradshaw and his investigators, as well as Sergeant James Bell ("Sergeant Bell") of FPD, respond to the house to assist in the investigation (*Id.*, ¶ 71).  Lieutenant Bradshaw videotaped a walk-through of the house after he arrived (*Id.*, ¶ 72).  Sergeant James Bell discovered a drop of blood on the bumper of the car, and Holmes was found dead in the trunk (*Id.*, ¶ 73).

Mike Hall of the ASP assumed the role of "case agent" and conducted a crime scene search with Lieutenant Bradshaw, Sergeant McAnally, and Chief Poole (*Id.*, ¶ 74).  Hall was responsible for gathering and collecting evidence at the crime scene and transporting it to the crime laboratory (*Id.*, ¶ 75).  FPD officers conducted a canvas of the neighborhood and gave their notes to Sergeant McAnally (*Id.*, ¶ 76).  On September 23, 1988, ASP and FPD officers including Lieutenant Bradshaw, Sergeant McAnally, and Chief Poole met for approximately one hour to coordinate regarding the information that they had obtained (*Id.*, ¶ 77).  Plaintiffs, with citation to record evidence, assert that Investigator Earley may have been at this meeting along with other Fordyce investigators (*Id.*).  Investigator Godwin replaced Hall as the "case agent" for ASP and assumed responsibility for the case (*Id.* ¶ 78).  On October 5, 1988, Lieutenant Bradshaw submitted an

automobile key and the fingerprints of Johnny Endsley, Matthew Bradley, Douglas Styles, Grady Brown, and Bobby Ray Neal to the state crime laboratory (*Id.*, ¶ 79).    Grady Brown was interviewed by Sergeant McAnally and was eventually eliminated as a suspect (*Id.*, ¶ 80).

### Witness Interviews

It is undisputed that Taura Bryant agreed to reveal herself as an informant to the prosecuting attorney in a document dated April 27, 1989, and witnessed by Investigator Earley and Terry Bryant, Bryant's brother (the "Bryant Agreement") (*Id.*, ¶ 84).    The Bryant Agreement referenced the prior audio-taped interview of Bryant and stated that the tapes were reviewed by Lieutenant Bradshaw and Investigator Godwin (*Id.*, ¶ 85).    The Bryant Agreement stated that Investigator Earley had previously advised Bryant that he would act as the "informant" to provide [Ms.] Bryant's information to police (*Id.*, ¶ 86).    The Bryant Agreement stated that on April 22, 1989, Investigator Earley informed Bryant that he had met with the prosecuting attorney and that her identity would have to be disclosed (*Id.,* ¶ 87).    Bryant was interviewed by Investigator Earley and Investigator Godwin on May 24, 1989, and Bryant implicated Early, Vaughn, Brown, and Jimerson in the murder of Holmes (*Id.*, ¶ 88).    A handwritten summary of the interview was signed by Bryant and witnessed by Investigator Earley and Investigator Godwin (*Id.*).    Investigator Godwin also dictated an additional summary of the interview (*Id.*).    Bryant is deceased (*Id.*, ¶ 89).

Investigator Godwin authored a report stating that he, accompanied by Chief Poole, met with Robin Wynne on May 26, 1989 (*Id.*, ¶ 90).    The report states that the purpose of the meeting was to attempt to obtain warrants for Early, Vaughn, and Brown, and that a complete copy of the case file was presented to Robin Wynne (*Id.*).    Darrell Jenkins is deceased (*Id.*, ¶ 92).

On March 5, 1990, Investigator Case and Investigator Godwin interviewed Shannon Manning at Skyline High School in Oakland, California (*Id.*, ¶ 93).    Investigator Godwin authored

the ASP report of the March 5, 1990, interview (the "Manning Report") (*Id.*, ¶ 94).  The Manning Report is the only report of the interview in ASP File 68-575- 88 and indicates that a copy of the report went to Investigator Godwin (*Id.*).  Plaintiffs contend that Investigator Case "fabricated Shannon Manning's purported statement summarized in ASP Investigator Godwin's March 8, 1990, report . . ." (*Id.*, ¶ 95).  Shannon Manning's mother lived with Early's uncle (*Id.*, ¶ 96).

Fordyce Defendants claim that the Manning Report states that Manning said that Early "ran with" a group including Brown and Vaughn (*Id.*, ¶ 97).  Fordyce Defendants further claim that the Manning Report states that Manning said that Early "always hung around with John Brown until John Brown and Reginald Early got in a fight in the Mill Quarters because one of them had said the other had killed Mrs. Holmes" and that Jimerson was present for this fight (*Id.*, ¶ 98).

### Relationships Between Suspects

Fordyce Defendants assert that Brown was one of Jimerson's only friends (*Id.*, ¶ 99).  On July 27, 1988, Jimerson was present when Brown shot a man named Houston Reeme (*Id.*, ¶ 100).

On July 31, 1988, Jimerson was present when Brown was stabbed by her ex-boyfriend, Sonny Tidwell (*Id.*, ¶ 101).  Vaughn was in a car with Jimerson the week of the Holmes murder (*Id.*, ¶ 102).  Jimerson knew Early when he was a child (*Id.*, ¶ 103).  Early lived with his grandmother around the corner from Jimerson in the Mill Quarters neighborhood (*Id.*).

Vaughn and Brown are related (*Id.*, ¶ 104).  Their fathers are cousins (*Id.*).  Vera Vaughn, Vaughn's mother, testified that she saw Vaughn and Jenkins get into a car with Brown on two occasions (*Id.*, ¶ 105).  Early was once shot on the corner of 6th and Brown streets in the Greenville neighborhood of Fordyce (*Id.*, ¶ 106).  Early testified that people would hang out at this corner and that Vaughn sometimes would hang out around the area (*Id.*, ¶ 107).  Brown was previously the

10

suspect in a rape (*Id.*, ¶ 108). The rape victim's address is listed in the incident report as 6th and Brown (*Id.*).

### Charlie Vaughn

On March 25, 1985, Vaughn was sentenced to three years of incarceration for a robbery he committed with Jenkins on March 11, 1985 (*Id.*, ¶ 109). On February 24, 1989, Vaughn was interviewed by Investigator Godwin, Lieutenant Bradshaw, and Investigator Earley at the Varner Unit of the Arkansas Department of Corrections ("ADC") (*Id.*, ¶ 110).[2] According to Fordyce Defendants, Vaughn stated that he knew nothing about the Holmes murder (*Id.*). On April 19, 1989, Vaughn was interviewed again by Investigator Godwin and Investigator Earley at the Varner Unit of the ADC (*Id.*, ¶ 111). Investigator Godwin dictated a report of the interview in which Vaughn stated that he knew nothing about the Holmes murder and that he was not associated with Brown or Early (*Id.*). When told that a blood sample would be drawn for comparison with a DNA sample from Holmes, Vaughn is said to have replied that "he would be right back in prison for the rest of his life" and would kill himself (*Id.*).

On August 7, 1989, Vaughn was interviewed by Investigator Godwin and Chief Poole at the Varner Unit of the ADC and did not provide any information about the Holmes murder (*Id.*, ¶ 112). Vaughn was told that blood samples would be taken from him pursuant to a court order, and he was physically restrained by Investigator Godwin and Varner Unit officers (*Id.*, ¶ 113). Infirmary personnel drew blood samples from Vaughn (*Id.*). The samples were given to Investigator Godwin and Chief Poole (*Id.*). Chief Poole sent Vaughn's blood sample to Cellmark

---

[2] The Arkansas Division of Correction was formerly known as the Arkansas Department of Corrections, which is how the parties refer to the ADC.

Diagnostics in Germantown, Maryland, to test for a match with vaginal swabs from Holmes (*Id.*, ¶ 114).

In an August 24, 1989, report, Cellmark Diagnostics responded to Chief Poole stating that the DNA detected from Holmes' vaginal swabs did not originate from Vaughn (*Id.*, ¶ 115). On September 18, 1989, Investigator Godwin received the report and met with Robin Wynne to advise him of the results and discuss obtaining blood samples from Early and Brown (*Id.*, ¶ 116). On February 5, 1990, Investigator L.A. Franklin of ASP attempted to interview Vaughn, but Vaughn declined to respond when questioned (*Id.*, ¶ 117).

### Reginald Early

On January 29, 1990, Investigator Case filed an affidavit requesting a court order for a blood sample to be drawn from Early (*Id.*, ¶ 118). The affidavit contains the signature of Marilyn Norman (*Id.*). On January 30, 1990, Investigator Case and Investigator Godwin went to the Tucker Unit of the ADC to interview Early (*Id.*, ¶ 119). Early did not respond when he was asked if he killed Holmes (*Id.*). Investigator Godwin dictated a report of the interview (*Id.*). On January 31, 1990, Chief Stage sent Early's blood sample to Cellmark (*Id.*, ¶ 120).

### Tina Jimerson

On April 20, 1989, Jimerson was interviewed by Investigator Kellam and Investigator Godwin (*Id.*, ¶ 121). Investigator Godwin dictated the report of the interview, in which Jimerson was advised of her Miranda rights and stated that she was with Benny Cox and Helen Childs the Tuesday before Holmes was killed, and that they saw Brown and Vaughn that same evening (*Id.*).[3] Jimerson testified that the information in the report was accurate other than the day and time that

---

[3]    Fordyce Defendants refer to Benny Cox in its Statement of Fact (Dkt. No. 185). Plaintiffs' response refers to Bennie Cox (Dkt. No. 205). The Court will assume that Benny Cox and Bennie Cox is the same individual.

she was with Benny Cox and Helen Childs and that the harassment she claimed by officers did not occur until the early 1990s (*Id.*, ¶ 122).

On May 19, 1989, William Setterman of the Calhoun County Sheriff's Department met with Jimerson, who reported that she had been raped (*Id.*, ¶ 123). The following day, Setterman sent a letter to Investigator Godwin, writing that Jimerson became nervous after he mentioned the Holmes rape and murder and that she stated "some people were saying that she had taken John Brown to the Myrtle Holmes residence," which she denied, but said she had driven Brown to the "Southside somewhere a couple of blocks behind the Fordyce Police Dept." (*Id.*).

On June 22, 1989, Jimerson was interviewed by Investigator Godwin, the Wynnes, and Chief Poole at the Wynnes' office (*Id.*, ¶ 124). In a taped and transcribed interview, Jimerson stated that she was at home on the night of the Holmes murder and that she was with Benny Cox the day before (*Id.*). Jimerson admitted that she was an associate of Brown but denied being with him, Early, and Vaughn on the date of the murder (*Id.*). Investigator Godwin dictated a report of the interview (*Id.*). Plaintiffs dispute this (*Id.*). With citation to record evidence, Plaintiffs claim that Jimerson says that she was with Bennie Cox and Helen Childs the night of the murder, and after that she went home where she stayed for the rest of the night (*Id.*).

On January 27, 1990, Jimerson was interviewed by Investigator Case and Setterman (*Id.*, ¶ 125). Jimerson was advised of her *Miranda* rights and signed a statement which read, "I took John Brown down to the southside somewhere behind the Fordyce Police Dept. I dropped him off at the stop sign." (*Id.*). Jimerson testified that the written statement she signed is true (*Id.*, ¶ 126).

**John Brown**

On March 3, 1990, Brown was interviewed by Investigator Case and Investigator Godwin at the Clark County Jail in Las Vegas, Nevada (*Id.*, ¶ 127). Investigator Godwin dictated a report

of the Brown interview, in which Brown stated that he knew Jimerson and Early, but he knew nothing about the Holmes murder (*Id.*, ¶ 128). On March 3, 1990, Investigator Case and Investigator Godwin executed a search warrant on Brown for hair, blood, pubic hair, and a saliva sample (*Id.*, ¶ 129). Investigator Case took the blood sample and shipped it for DNA testing (*Id.*).

**Suspects Charged, Arrested, And Interviewed**

On March 9, 1990, Investigator Godwin was advised by FPD that Early's blood sample matched the sample taken from Holmes (*Id.*, ¶ 130). Investigator Case told Investigator Godwin that he had already notified Robin Wynne and that Robin Wynne would file charges against Early as a result (*Id.*). Robin Wynne said of the timing of charges that "we acquired the DNA samples from the defendant, Reginald Early, and after we received that match and made a determination plus other interviews, we decided to file charges. We felt like we had enough information in my opinion to prove our case." (*Id.*, ¶ 131). Regarding filing charges against Brown, Robin Wynne stated, "We had a report that they had found a match on Reginald Early. Further, that fit in with all of the other statements that we received at the time, that Reginald [Early] and John Brown were together that night." (*Id.*, ¶ 132).

On March 16, 1990, Robin Wynne filed capital murder charges against Early, Brown, and Vaughn by felony information (*Id.*, ¶ 133). On April 30, 1990, Investigator Godwin marked the Holmes case as closed by arrest effective and noted that he arrested Vaughn and Early on that date at the Dallas County Sheriff's Office (*Id.*, ¶ 134). The report states that Brown was an inmate of the Clark County Sheriff's Department in Las Vegas, Nevada, and that Brown pled guilty to second degree murder in a case pending in Nevada (*Id.*). Plaintiffs dispute that Brown pled guilty to second degree murder in Nevada (*Id.*). Plaintiffs claim that no details or direct evidence of this charge or conviction is in the record, and the only evidence of it is inadmissible hearsay (*Id.*).

14

On April 30, 1990, Early was interviewed by Investigator Godwin at the Dallas County Sheriff's Office and declined to speak after being advised of his rights (*Id.*, ¶ 135). Investigator Godwin dictated a summary of the interview (*Id.*). On that same date, Vaughn was interviewed by Investigator Godwin at the Dallas County Sheriff's Office and Vaughn "stated that he would not give a statement" after being advised of his rights (*Id.*, ¶ 136). Investigator Godwin dictated a summary of the interview and made additional notes that Vaughn resisted when Investigator Godwin attempted to fingerprint him and that Investigator Godwin put Vaughn in a restraining hold (*Id.*). Vaughn stated that he was choked (*Id.*).

### Howard Enters His Appearance

On May 18, 1990, Attorney William Howard filed a motion on behalf of Early requesting discovery from the prosecution (*Id.*, ¶ 137). In a report dated June 26, 1990, Cellmark concluded, "The DNA detected from the [two] vaginal swabs from Myrtle Holmes did not originate from the blood of John L. Brown." (*Id.*, ¶ 138). On August 27, 1990, Tom Wynne stated under oath before Judge Graves that "John Brown, Jr., did unlawfully, acting together with Reginald [Early] and Charlie Vaughn, commit rape and robbery, and in the course of and in furtherance of the felonies did cause the death of Myrtle Holmes." (*Id.*, ¶ 139).

On or about August 27, 1990, Brown was arrested in Nevada (*Id.*, ¶ 140). In response to an oral motion to dismiss by Jeffrey on behalf of Brown, Robin Wynne said regarding Brown, "it took us some time to have him extradited to Fordyce" and that "[t]he State feels like he fled." (*Id.*, ¶ 141). On October 3, 1990, Howard filed a motion on Early's behalf for his commitment to the South Arkansas Health Center for Mental Examination (*Id.*, ¶ 142). Judge Graves ordered that Early be committed to the Southeast Arkansas Regional Health Center for a mental evaluation (*Id.*, ¶ 143). There are no results for a mental evaluation of Early in the appellate record (*Id.*, ¶ 144).

On October 23, 1990, Brown was returned to Arkansas (*Id.*, ¶ 145). On October 26, 1990, Brown was arraigned (*Id.*, ¶ 146). During his arraignment, Brown informed the Court that he would retain Howard as his attorney (*Id.*).

On October 27, 1990, Howard met with Early at the Tucker Unit of the ADC (*Id.*, ¶ 147).

### Ronnie Prescott

On August 14, 1990, Robin Wynne filed an Information in the Dallas County Circuit Court accusing Ronnie Edward Prescott of conspiring to manufacture a controlled substance, crystal methamphetamine (*Id.*, ¶ 149). On September 27, 1990, a bench warrant for Prescott was faxed (*Id.*, ¶ 150).

On Friday, March 22, 1991, Prescott was picked up by Sheriff Ford and Chief Poole from Huntsville, Texas, and driven to Fordyce, Arkansas, because of Prescott's pending drug charges in Dallas County (*Id.*, ¶ 151). Sheriff Ford drove the vehicle, and Chief Poole was in the front passenger seat (*Id.*). Prescott estimated that this drive was 5.5 hours, and the Holmes murder investigation came up 3.5 hours into the ride (*Id.*). Sheriff Ford made an agreement with Prescott that his pending charges would be dismissed, and Prescott would have immunity if Prescott wore a recorder and engaged his soon-to-be cellmate in conversation about a murder in which the cellmate was a suspect (*Id.*, ¶ 152).

### Prescott-Vaughn Recording

Sheriff Ford gave Prescott a recording device and Prescott was placed in a cell with Vaughn (*Id.*, ¶ 154). Prescott recorded Vaughn for about an hour over multiple conversations, and Prescott returned the recorder to Sheriff Ford after holding it overnight (*Id.*, ¶ 155). Fordyce Defendants represent that Sheriff Ford put the tape in his drawer and did not give it to anyone else (*Id.*, ¶ 156). When asked if he recorded over the tape, Sheriff Ford responded that he was not sure if he did or

not (*Id.*).  On Sunday, March 24, 1991, Prescott was interviewed by Lieutenant Bradshaw (*Id.*, ¶ 157).  Lieutenant Bradshaw dictated the report of the interview which states that Chief Poole, Sheriff Ford, and Remet were also present (*Id.*, ¶ 158).  Fordyce Defendants allege that Plaintiffs claim that Chief Poole "concealed that Ronnie Prescott's conversations with Vaughn had been tape-recorded" and "concealed the substance of the interview of Ronnie Prescott on March 24, 1991." (*Id.*, ¶ 159).  Prescott has consistently testified that he had no conversations with Chief Poole regarding any interactions with Vaughn (*Id.*, ¶ 160).

Lieutenant Bradshaw also wrote a handwritten statement of the interview (the "Prescott Statement") (*Id.*).  The Prescott Statement is in ASP File 68-575-88 (*Id.*, ¶ 163).  The Prescott Statement is dated March 24, 1991, at 3:45 p.m. and contains Prescott's purported signature, with Lieutenant Bradshaw and Chief Poole as witnesses (*Id.*, ¶ 164).  The Prescott Statement is written in the first person and says that on Saturday, March 23, 1991, Vaughn told Prescott "about the night the old lady was murdered in Fordyce" and described the roles that "he, John Brown, Reggie and Tina" had in the crime (*Id.*, ¶ 165).

After being shown the Prescott Statement at his deposition, Prescott did not recall giving the information within, but he testified that the contents of his recording of Vaughn were "basically what's written right there." (*Id.*, ¶ 166).  Fordyce Defendants claim that, according to Prescott, Vaughn never claimed innocence of the murder charges he faced, and Prescott did not provide any information to Vaughn or prompt him with any questions (only responding "yeah," "right," "okay," etc.) (*Id.*, ¶ 167).  At his deposition, Prescott did not recall bringing up the death penalty with Vaughn (*Id.*, ¶ 168).

Fordyce Defendants claim that Butler and Parrish met with Sheriff Ford in Sheriff Ford's office for approximately three to five minutes to discuss Sheriff Ford's involvement with Prescott

(*Id.*, ¶ 170). When asked how they came to meet with Sheriff Ford, Parrish said of Butler, "David evidently knew something I did not know." (*Id.*)

According to Fordyce Defendants, on July 9, 1991, a prosecutor from the Thirteenth Judicial District made a motion to *nolle pros* case CR90-47 against Prescott, which was granted by Judge Graves (*Id.*, ¶ 171). Parrish stated, "whatever agreement that Sheriff Ford had made with Ronnie Prescott, Butler felt had to be honored ethically." (*Id.*). Plaintiffs claim that Parrish made the quoted statement in his deposition in this case and not as part of case CR90-47 (*Id.*).

According to Fordyce Defendants, Plaintiffs claim that Chief Poole "concealed his interactions with Ronnie Prescott en route from Huntsville, Texas to Fordyce County, Arkansas [*sic*] on or about March 21, 1991." (*Id.*, ¶ 172).

Butler and Parrish prosecuted Randy Bill Keeling (*Id.*, ¶ 173). Fordyce Defendants claim that, on direct examination by Butler at Keeling's trial, Prescott acknowledged that he had aided the State to get out of charges and testified about his interaction with Sheriff Ford (*Id.*, ¶ 174).

**Vaughn Confesses And Pleads Guilty**

It is undisputed that on January 28, 1991, Judge Graves appointed Remet as counsel for Vaughn (*Id.*, ¶ 175). On that same date, Remet filed in open court a change of plea to "not guilty and not guilty by reason of mental disease or defect" and requested that Vaughn be "committed to the State Hospital" for a competency evaluation (*Id.*, ¶ 176).

On February 21, 1991, Judge Graves ordered that Vaughn be committed to the Southeast Arkansas Regional Health Center for a mental examination (*Id.*, ¶ 177). There are no results of a mental examination for Vaughn in the court file for case CR-90-18 (*Id.*, ¶ 178). Plaintiffs do not have any evaluation by a mental health professional of Vaughn's mental capacity at any point prior to 1993 (*Id.*).

On February 28, 1991, the Dallas County Circuit Court set March 25, 1991, at 1:30 p.m. as the final plea day for defendants on its criminal trial calendar including Randy Bill Keeling, CR-90-35, Prescott, CR-90-47, Early, CR-90-16, Vaughn, CR-90-18, and Brown, CR-90-17 (*Id.*, ¶ 179).

Fordyce Defendants claim that on Sunday, March 24, 1991, Robin Wynne called Remet at about 8:30 a.m. to "have a conference with Vaughn and with the Sheriff." (*Id.*, ¶ 180). After Remet arrived, Robin Wynne was told that Vaughn was willing to make a statement to Lieutenant Bradshaw and the sheriff's department (*Id.*).

Fordyce Defendants claim that on March 24, 1991, at 4:18 p.m., Lieutenant Bradshaw and Sergeant McAnally interviewed Vaughn (*Id.*, ¶ 181). Sergeant McAnally dictated the report of the interview on March 27, 1991, which states that Chief Poole, Sheriff Ford, Remet, and Vera Vaughn were present and that the interview was recorded by video (*Id.*). Sergeant McAnally had possession of the video tape at the time of the dictation (*Id.*).

It is undisputed that the video tape was not used as evidence in either criminal trial (*Id.*, ¶ 182). According to Fordyce Defendants, Plaintiffs claim that Chief Poole "concealed the substance of the interview of Charlie Vaughn on March 24, 1991." (*Id.*, ¶ 183).

On March 25, 1991, a plea agreement stating that Vaughn was charged with capital murder and would enter a plea of guilty to murder in the first degree was filed in open court with the signatures of Vaughn, Remet, and Robin Wynne (*Id.*, ¶ 184). Fordyce Defendants claim that, on that same date, Vaughn pleaded guilty to first degree murder in a plea hearing before Judge Graves (*Id.*, ¶ 185). He responded to questions from Judge Graves and provided testimony to support his plea, implicating himself, Early, Brown, and Jimerson in the murder of Holmes (*Id.*).

It is undisputed that Judge Graves asked about the status of Vaughn's mental evaluation, and Vaughn responded that it was completed (*Id.*, ¶ 186). When asked who examined him, Vaughn responded, "some guy in El Dorado" and later specified it was "Doctor Peal." (*Id.*). Judge Graves accepted Vaughn's plea and found that Vaughn voluntarily, intelligently, and knowingly entered his plea of guilty (*Id.*, ¶ 187). Judge Graves sentenced Vaughn to life in the ADC, giving him five months credit for time that Vaughn had served, and noting "I'm sure that some governor somewhere down the road will reduce the sentence or commute it to a term of years." (*Id.*). Fordyce Defendants represent that Robin Wynne informed the Court that "there was a video made yesterday of a statement and the statement will be transcribed as well," and Remet stated that "the videotape was simultaneously recorded on a regular recorder as well." (*Id.*, ¶ 188). It is undisputed that there are no transcriptions of Vaughn's March 24, 1991, statement in ASP File 68- 575-88 (*Id.*, ¶ 189).

Robin Wynne placed on the record that "during the noon hour" prior to the plea hearing, Vaughn gave an oral statement to Robin Wynne and Remet (*Id.*, ¶ 190). Robin Wynne stated, "that statement he gave us verbally is the same statement that he has now given the Court." (*Id.*).

It is undisputed that Vaughn later testified that Robin Wynne and Remet advised him to plead guilty (*Id.*, ¶ 191). Fordyce Defendants claim that Vaughn testified that "the prosecutor and my other lawyer" were the reason he testified as he did at his plea hearing (*Id.*, ¶ 192).

Fordyce Defendants claim that Vaughn was not aware of what evidence the police officers had and did not recall talking about the Holmes murder with Prescott or any man while incarcerated in the Dallas County Jail (*Id.*, ¶ 194).

### Jimerson's Arrest

It is undisputed that Chief Poole testified that he and Sheriff Ford received a warrant for Jimerson's arrest and arrested her on March 25, 1991 (*Id.*, ¶ 195). Jimerson was played a tape of Vaughn confessing that he committed the crime and implicating her as the driver (*Id.*, ¶ 196). Jimerson stated during her deposition, "All I can tell you is they played a tape of [Vaughn's] voice stating that I assisted him -- them in driving a getaway car to and from Ms. Myrtle Holmes." (*Id.*).

It is undisputed that on March 25, 1991, at 9:20 p.m., Howard visited Jimerson at the Fordyce City Jail (*Id.*, ¶ 197). On March 27, 1991, Robin Wynne filed capital murder charges against Jimerson by felony information (*Id.*, ¶ 198). On the same date, Jimerson had her initial appearance (*Id.*, ¶ 199). Attorney Tracey Bagwell was appointed by the court to represent Jimerson (*Id.*). On April 10, 1991, Howard filed a motion to substitute counsel for Jimerson and a motion for discovery on Jimerson's behalf in Dallas County Circuit Court (*Id.*, ¶ 200).

### Kenny And Lee Parsons

It is undisputed that Kenny Parsons and Lee Parsons are brothers who lived together at the time of the Holmes murder in September 1988 (*Id.*, ¶ 202).

According to Fordyce Defendants, on the same day that Jimerson was arrested, Kenny Parsons was interviewed by Chief Poole and Sheriff Ford at 7:36 p.m. (*Id.*, ¶ 201). Kenny Parsons was shown his *Miranda* rights, and he stated that Brown came to his house while bloody, along with Early, Vaughn, and Jimerson (*Id.*). Investigator Godwin dictated a report of the interview which was taped and then transcribed (*Id.*). Fordyce Defendants claim that on March 27, 1991, Lee Parsons was interviewed by Sheriff Ford and Jessie Dean Brandon of the Dallas County Sheriff's Office (*Id.*, ¶ 203). Lee Parsons said that Brown came to his house bloody and "Teen"

brought him there (*Id.*).  Sheriff Ford clarifies that "Teen" was Jimerson (*Id.*).  The report of the interview was transcribed by Investigator Godwin (*Id.*).

In response to these two statements, Plaintiffs do not dispute that a report documents the interviews (*Id.*, ¶¶ 201, 203).  However, Plaintiffs dispute that the events recounted actually occurred (*Id.*).

It is undisputed that Plaintiffs claim that Chief Poole "fabricated the statement of Charlie Vaughn and the statements of Lee Parsons and Kenny Parsons." (*Id.*, ¶ 204).

On January 30, 2015, Lee Parsons was arrested by Ronnie Smith, Ryan Coleman, and Dusty Walton of the Dallas County Sheriff's Department for cocaine possession and assault (*Id.*, ¶ 205).  Lee Parsons spoke to Plaintiffs' counsel for 15-20 minutes on two or three occasions prior to his 2023 deposition (*Id.*, ¶ 206).  Fordyce Defendants represent that Lee Parsons smoked a blunt of marijuana before his 2023 deposition (*Id.*, ¶ 207).

It is undisputed that at his deposition, Lee Parsons claimed that he was questioned by police within a few weeks of the Holmes murder and was told that they would put in him in jail if he did not say what they wanted him to say (*Id.*, ¶ 208).  Fordyce Defendants assert that, when asked who he was talking to, Lee Parsons replied, "I believe it was Ronnie Poole." (*Id.*).

Fordyce Defendants assert that Lee Parsons stated that he was questioned by police "because they knew John had stayed with me" and that he did not know if police officers spoke to his brother (*Id.*, ¶ 210).

Lee Parsons claimed that his 2015 arrest by Ronnie Smith and other Dallas County Sheriff's Department employees was conducted by Chief Poole (*Id.*, ¶ 211).

Chief Poole is an instructor with the Arkansas Law Enforcement Training Academy and had been in that position for 27.5 years at the time of his March 28, 2023, deposition (*Id.*, ¶ 212).

When confronted with the fact that Chief Poole was not a police officer at the time of his 2015 arrest, Lee Parsons responded, "I'm confused sir. I'm confused. I don't know what to say," and "I don't remember so much about none of this." (*Id.*, ¶ 213).

Kenny Parsons testified that his brother, Lee Parsons, has "just been having some hard times in his life right now." (*Id.*, ¶ 214).

In 2023, Kenny Parsons had no memory of being interviewed by Chief Poole or testifying at either criminal trial (*Id.*, ¶ 215). Kenny Parsons testified regarding the DTF, "I ain't never had no run-ins with them, no." (*Id.*, ¶ 216). He stated, "I never really done nothing wrong for them to get me in serious trouble." (*Id.*).

**Additional Pre-Trial Action**

On April 22, 1991, Howard filed a discovery motion on behalf of Early, requesting an order directing that Cellmark make the original "autorads" available for his defense expert (*Id.*, ¶ 217). On the same date, Howard filed a second discovery motion on behalf of Early, specifically requesting audio and video tapes regarding the confession of a co-defendant, the identities of informants, witnesses the prosecuting attorney intended to call, and records of witnesses' criminal convictions (*Id.*, ¶ 218).

On May 15, 1991, Howard filed a motion to compel the prosecutor to comply with the Arkansas Rules of Criminal Procedure, which acknowledged receipt of a response to his motion regarding "autorads" and stated that there was no response to the second discovery motion (*Id.*, ¶ 219).

On May 16, 1991, Robin Wynne filed a response to Howard's motion for discovery (the "Response to Motion for Discovery") which listed witnesses and stated that the "State of Arkansas has no knowledge of any informant who led to or assisted in making the arrest in this matter," and

that the "State of Arkansas recently received two cassette tapes which are conversations with Kenny Parsons and Lee Parsons regarding this matter." (*Id.*, ¶ 220). The Response to Motion for Discovery attached documents in the State's possession regarding Early's prior convictions (*Id.*, ¶ 221). These documents included an information accusing Early of breaking and entering the Wynne Law Firm on December 30, 1987 (*Id.*). Also included was a plea agreement for case CR86-37 showing Early as defendant and Robin Wynne as his attorney (*Id.*). Howard testified that he was not aware that Early had previously been represented by Robin Wynne or that the Wynnes were the victims of a crime involving Early (*Id.*, ¶ 222).

On or about June 2, 1991, Brown accepted the court's appointment of Bill Murphy to represent him (*Id.*, ¶ 223). On July 19, 1991, Howard filed a motion for severance of defendants on behalf of Jimerson, stating that "the Defendant is of the opinion that a severance of defendants is appropriate to promote a fair determination of her guilt or innocence." (*Id.*, ¶ 224).

On October 23, 1991, Murphy filed a series of motions on Brown's behalf (*Id.*, ¶ 225). On November 8, 1991, Howard filed a motion for continuance of the December 1991 court date on Early's behalf, citing a separate case on appeal which considered the admissibility of DNA evidence (*Id.* ¶ 226). On November 12, 1991, Ellis Tidwell was interviewed by Investigator Godwin (*Id.*, ¶ 227). Investigator Godwin authored a report of the interview, in which Ellis Tidwell stated that Vaughn worked for Ellis Tidwell, that Vaughn and Brown came to the house where Ellis Tidwell stayed with his mother at about 11:00 p.m. on the night that Holmes was murdered, and Vaughn asked for an advance on his pay (*Id.*). Ellis Tidwell lived about 200 yards from Holmes (*Id.*).

On November 14, 1991, Murphy filed a motion for discovery on behalf of Brown (*Id.*, ¶ 228). On the same date, Murphy filed on behalf of Brown a motion for psychiatric evaluation (*Id.*,

¶ 229).  On November 18, 1991, Judge Graves ordered that Brown be committed to the Southeast

Arkansas Mental Health Clinic for a mental examination (*Id.*, ¶ 230).  There are no results for a

mental evaluation of Brown in the appellate record (*Id.*, ¶ 231).

Tom Wynne was aware that Vaughn would recant his confession prior to trial (*Id.*, ¶ 232).

On November 19, 1991, court reporter Marian Schmidt mailed a copy of the 21-page transcript of

Vaughn's March 25, 1991, plea to Robin Wynne, Judge Graves, the circuit clerk, Howard, and

Murphy (*Id.*, ¶ 233).  On November 26, 1991, Howard filed another motion for continuance of the

December 1991 court date on Early's behalf, citing the unavailability of the defense's DNA expert

(*Id.*, ¶ 234).  On November 27, 1991, Howard filed an amended motion for continuance on Early's

behalf based on "new evidence" in the form of a file "which the prosecutor had received recently

from one of the investigators involved in the case." (*Id.*, ¶ 235).  On December 10, 1991, the court

granted Early's motion for continuance, citing his expert witness' unavailability (*Id.*, ¶ 236).

### Trial Preparation

Witness subpoenas signed by Robin Wynne were issued for Lee Parsons, Manning, Ellis

Tidwell, Jenkins, and other witnesses to meet with prosecutors at the Wynne Law Firm office on

April 15 or 17, 1992 (*Id.*, ¶ 237).  Howard never met with any law enforcement before the criminal

trials (*Id.*, ¶ 238).  Murphy testified that before the criminal trials he talked to Chief Poole, Sheriff

Ford, and possibly Investigator Earley, but he did not recall meeting with ASP investigators or any

other witnesses (*Id.*, ¶ 239).  Murphy did not recall anything about his meeting with Chief Poole

(*Id.*).

### April Trial

The first criminal trial of Early, Brown, and Jimerson was held in the Dallas County Circuit

Court before Judge Graves on April 21–27, 1992 (the "April Trial") (*Id.*, ¶ 240).  Robin Wynne

and Tom Wynne represented the State of Arkansas (*Id.*). Early and Jimerson were represented by Howard (*Id.*). Brown was represented by Murphy and Jeffrey (*Id.*). Jimerson testified at her deposition that at the beginning of her first criminal trial that Jimerson heard Sheriff Ford discuss a tape, of which prosecutors and the judge were aware (*Id.*, ¶ 241). Sheriff Ford "stated that he had a tape that they told him that he could not use." (*Id.*). Howard was present when this occurred (*Id.*). Plaintiffs dispute that Sheriff Ford revealed the Prescott Tape to the judge, prosecutors, or defense counsel at any point (*Id.*).

Investigator Kellam did not testify at the April Trial (*Id.*, ¶ 242). Jeffrey cross-examined Chief Poole about interviewing Kenny Parsons and Lee Parsons (*Id.*, ¶ 243). Investigator Case testified regarding the blood draws of Brown and Early and interviewing Jimerson (*Id.*, ¶ 244). Investigator Case was cross-examined by Howard, but not by Murphy or Jeffrey (*Id.*). Bryant testified that all four co-defendants attended a party at Levi Grandy's house on the night of the murder and attended another party the night after the murder, where statements were made about Holmes' murder (*Id.*, ¶ 245). Plaintiffs, with citation to record evidence, dispute that Bryant was telling the truth and that the mentioned party ever happened (*Id.*).

Ellis Tidwell testified that Vaughn and Brown came to his house on the night of Holmes' murder and that Vaughn introduced him to Brown (*Id.*, ¶ 246). Howard objected to Ellis Tidwell's testimony, and Howard and Murphy claimed that they never received a statement from Ellis Tidwell (*Id.*, ¶ 247). The State responded that they had an open-file policy, and the statement was in the file (*Id.*). Murphy stated, "I may have overlooked I, but I thought I copied everything in the file." (*Id.*). Judge Graves noted that there were previous informal conferences, and "the Court was assured that all discovery had been complied with." (*Id.*). Jenkins testified that Early confessed that he killed Holmes and took money from her house (*Id.*, ¶ 248). Fordyce Defendants claim that

Lee Parsons testified that Brown came to his house the night of Holmes' murder to change his blood-stained clothes, and that Early, Vaughn, and Jimerson came with him (*Id.*, ¶ 249). Plaintiffs, with citation to record evidence, dispute this (*Id.*).

During cross-examination of Lee Parsons, Howard asked him if he did drugs and Lee Parsons responded, "No." (*Id.*, ¶ 250). Howard met with Lee Parsons in 1991 (*Id.*, ¶ 251). On cross examination by Murphy, Lee Parsons testified that he gave his only statement to law enforcement on March 27, 1991 (*Id.*, ¶ 252). Murphy used a rights form signed by Lee Parsons while cross examining him (*Id.*). The signed rights form of Lee Parsons is not included in ASP File 68-575-88 (Dkt. No. 185, ¶ 253).

Lee Parsons stated that Sheriff Ford came to his house after Sheriff Ford talked to his brother and that he had not been promised anything in exchange for testifying (*Id.*, ¶ 254). On direct examination, Kenny Parsons testified that he was interviewed by Chief Poole about Holmes' murder months after it occurred and that he told Chief Poole then that he did not know anything about the crime (*Id.*, ¶ 255). Kenny Parsons further testified that he had not been offered anything from the prosecutor's office, Chief Poole, or Sheriff Ford in exchange for testifying (*Id.*, ¶ 256). Howard cross-examined Kenny Parsons using a rights form from his interview with Poole (*Id.*, ¶ 257). The signed rights form of Kenny Parsons is not included in ASP File 68-575-88 (*Id.*, ¶ 258). Murphy moved for a mistrial after Kenny Parsons testified that he became friends with Brown before the murder and that he and Brown had done drugs together (*Id.*, ¶ 259). The Court denied the motion (*Id.*). Howard cross-examined Kenny Parsons about battery charges and whether he coerced the testimony of his brother, Lee Parsons (*Id.*, ¶ 260). Kenny Parsons responded that he and Lee Parsons did not discuss how they were going to testify (*Id.*). Vaughn was also called as a witness and denied being with Early, Brown, or Jimerson at any time in September 1988 and

denied involvement in Myrtle Holmes' rape and murder (*Id.*, ¶ 261).  Robin Wynne and Tom Wynne read Vaughn's plea hearing transcript into the record (*Id.*, ¶ 262).  Howard and Murphy asked that the entire transcript be read (*Id.*).  Howard referenced visiting Vaughn while he was incarcerated at the Cummins Unit of the ADC (*Id.*, ¶ 263).  Howard later denied ever interviewing Vaughn and stated, "The only thing I knew about Charlie – or heard about Charlie Vaughn was that he was afraid of the death penalty, and he chose to take a plea." (*Id.*).

Neither Murphy nor Jeffrey cross-examined Vaughn (*Id.*, ¶ 265).  Jimerson testified about four separate contacts she had with law enforcement during the Holmes investigation on direct examination by Howard, beginning with her interview by Investigator Kellam and Investigator Godwin in 1989 and ending with her March 1991 arrest (Dkt. No. 185, ¶ 266).  Plaintiffs add that Jimerson responded "because you all told him to" when cross-examined by one of the Wynnes about why Vaughn previously testified to Jimerson's involvement in the crime (*Id.*).

On April 27, 1992, the Court declared a mistrial due to a hung jury (*Id.*, ¶ 267).

### Between Trials

On August 5, 1992, Robin Wynne filed a Second Amended Information against Early, Brown, and Jimerson, charging each with the first-degree murder and aggravated robbery of Holmes (*Id.*, ¶ 268).  On August 12, 1992, Investigator Earley prepared and provided prosecutors a formal written statement stating that he saw Early in the vicinity of Holmes' house on the morning of the murder (the "Investigator Earley Statement") (*Id.*, ¶ 269).  The Investigator Earley Statement is not included in ASP File 68-575-88 (*Id.*, ¶ 270).  On August 17, 1992, Howard filed a motion *in limine* stating "the prosecution has indicated that it has withdrawn certain DNA evidence which it had used in the original trial in April of this year, and there are no plans to use said scientific evidence at the retrial." (*Id.*, ¶ 271).

## August Trial

The second criminal trial of Early, Brown, and Jimerson was held in the Dallas County Circuit Court on August 17–19, 1992 (the "August Trial") (*Id.*, ¶ 272). Robin Wynne and Tom Wynne represented the State of Arkansas (Dkt. No. 185, ¶ 273). Howard represented Early and Jimerson (*Id.*). Brown was represented by Murphy and Jeffrey (*Id.*). DNA evidence was not introduced during the August Trial (*Id.*, ¶ 274). Neither Investigator Case nor Investigator Kellam testified in the August Trial (*Id.*, ¶ 275). Investigator Earley testified that he saw Early and two other men near Holmes' house on the night of the murder (*Id.*, ¶ 276).

Howard objected to Investigator Earley's testimony because he received the Investigator Earley statement shortly before trial and alleged that his testimony as a witness instead of an investigator was a surprise (*Id.*, ¶ 277). Bryant testified that Brown, Early, Jimerson, and Vaughn attended a party at Levi Grandy's house on the night of the murder and another party the next night (*Id.*, ¶ 278). Two of Jimerson's relatives informed Howard that they overhead Bryant asking Sheriff Ford what she should say on the stand (*Id.*, ¶ 279).

Lee Parsons testified that he did not come forward with information connecting Brown to the other defendants until March 27, 1991, after police approached him following his brother Kenny Parson's statement to police (*Id.*, ¶ 280). Kenny Parsons testified that Early, Brown, Jimerson, and Vaughn came to his home the night before he heard about the murder of Holmes, and that Brown was covered in blood and said he got into a fight with Sonny Tidwell (*Id.*, ¶ 281).

Sonny Tidwell stated that on the night of Holmes' murder, Vaughn and Brown came to his house around midnight, looking "wild-eyed," and Vaughn wanted money (*Id.*, ¶ 282). Sonny Tidwell said that he had never met the man accompanying Vaughn to his house before, but that Vaughn introduced him as Brown (*Id.*). During his trial testimony, Sonny Tidwell mentioned that

29

he first spoke to Investigator Earley about the crime only months after the murder, in December of 1988 (*Id.*, ¶ 283). At that time, Sonny Tidwell told Investigator Earley that he didn't want to get involved with Holmes' investigation because he "had his own set of problems." (*Id.*).

Vaughn testified that he confessed only at the insistence of his attorney, stating, "Man, like I told you, man, the lawyer was putting words in my mouth, man. I didn't know nothing about -- I don't know nothing about this murder, man." (*Id.*, ¶ 284). The court declared Vaughn a hostile witness, and his plea hearing transcript was read to the jury by Robin Wynne and Tom Wynne (*Id.*, ¶ 285). Neither Murphy nor Jeffrey cross-examined Vaughn (*Id.*). While cross-examining Vaughn, Howard used a letter written for Vaughn on July 5, 1990 (*Id.*, ¶ 286).

Howard said of the Wynnes during a bench conference, "these guys have not operated in good faith since I've been on the case. Anytime I've filed a discovery motion asking for the conviction record of their witnesses. They are obligated to disclose that information, which they never did . . . ." (*Id.*, ¶ 287).

Jimerson testified about her treatment by law enforcement during the Holmes investigation and described three interactions before her arrest: (1) receiving a subpoena from Chief Poole and being interviewed at the Wynne Law Office; (2) being questioned by Investigator Case and Setterman; and (3) contacting Setterman regarding her alleged rape (*Id.*, ¶ 288).

Murphy stated that he wanted to call two witnesses who were "essential to rebut the testimony of Darrell Jenkins" and unavailable but admitted that he had not previously spoken with either of the witnesses (*Id.*, ¶ 289). Murphy and Jeffrey rested without presenting witnesses for Brown (*Id.*, ¶ 290). Murphy argued in closing arguments that "Charlie Vaughn was visited by the state police at the Arkansas Department of Corrections and continually denied any involvement with Myrtle Holmes murder, and knowledge whatsoever. Then he was transported up here. He

had an attorney but the people downstairs, the police, got him to make a statement but didn't call his attorney.  And he says, 'Yeah, he did it.'" (*Id.*, ¶ 291).

Tom Wynne argued in his closing that "Charlie Vaughn had changed his statement downstairs and told people that he did it before Bob Remet even came over here" and acknowledged that Vaughn took a plea out of fear that he might be put to death (*Id.*, ¶ 292).

On August 19, 1992, the jury retired to consider their verdict at 11:10 a.m. and returned with a verdict at 1:22 p.m., finding Brown, Early, and Jimerson each guilty of both first-degree murder and aggravated robbery (*Id.*, ¶ 293).

### Appeal

Murphy turned his file over to Jeffrey after the conviction of Brown (*Id.*, ¶ 294).  On August 31, 1992, Jeffrey filed a notice of appeal to the Arkansas Supreme Court on behalf of Brown (*Id.*, ¶ 295).  On September 11, 1992, Howard filed notices of appeal to the Arkansas Supreme Court on behalf of Early and Jimerson (*Id.*, ¶ 296).

On July 30, 1993, Howard filed an abstract and brief with the Arkansas Supreme Court on behalf of Early and Jimerson (*Id.*, ¶ 297).  The brief argued that the trial court erred by failing to sever Jimerson, allowing Investigator Earley to testify, and refusing to grant a directed verdict (*Id.*).  On August 4, 1993, Jeffrey filed an abstract and brief with the Arkansas Supreme Court on behalf of Brown, which argued that the trial court erred in denying the motion for a directed verdict and denying the motion to dismiss for lack of speedy trial (*Id.*, ¶ 298).  On October 25, 1993, Howard filed a second abstract and brief with the Arkansas Supreme Court on behalf of Early and Jimerson (*Id.*, ¶ 299).  On November 19, 1993, Jeffrey filed a reply brief with the Arkansas Supreme Court on behalf of Brown (*Id.*, ¶ 300).  On January 10, 1994, the Arkansas Supreme Court affirmed the convictions of Brown, Early, and Jimerson in a single ruling (*Id.*, ¶ 301).

Howard produced documents from his representation of Early and Jimerson (the "Howard File"), which are attached and incorporated herein as Dkt. No. 185-40, excluding the interviews of Early and Jimerson that Howard conducted in Dkt. No. 185-26 (*Id.*, ¶ 302). Howard testified that "[w]hatever was in the file in 1992 is in the file now." (*Id.*, ¶ 303). The Howard File contains court filings and correspondence from the criminal trials and appeal of Jimerson and Early, trial notes, jury venire sheets, DNA research, and expert DNA reports (*Id.*, ¶ 304). The Howard File does not contain the Vaughn plea hearing transcript or any of the contents of ASP File 68-575-88 except for waiver of rights forms for Michael Pate and John Castleberry, polygraph reports for Matthew Bradley and Grady Brown, an arrest warrant for Sonny Tidwell, the ASP report of the April 20, 1989, Jimerson interview, and a waiver of rights form for Jimerson dated January 27, 1990 (*Id.*, ¶ 305). The Howard File contains transcripts of Kenny Parsons' March 25, 1991, interview and Lee Parsons' March 27, 1991, interview that differ from the transcripts found in ASP File 68-575-88 (*Id.*, ¶¶ 306–07). The Howard File contains a Cellmark report dated June 26, 1990, that is not included in ASP File 68-575-88 (*Id.*, ¶ 308).

Murphy testified that he turned over his file on the case (which has not been produced in this litigation) to Jeffrey soon after the convictions (*Id.*, ¶ 309).

**Jimerson Seeks Release**

Jimerson filed pardon applications through Institutional Release Services on December 27, 2007, and November 9, 2011 (*Id.*, ¶ 310). Jimerson stated in her 2007 pardon application, "I was falsely accused and wrongly convicted by Tom Wynne and Robert [sic] Wynne brothers and by Dallas County Sherriff Donny Ford, Dallas County Police Dept. Chief Doug P. Gill." (*Id.*, ¶ 311). In her 2007 pardon application, Jimerson discussed her contacts with law enforcement during the Holmes investigation (*Id.*, ¶ 312). Jimerson claimed Howard did not explain his conflict of interest

in representing a codefendant and that she "received ineffective counsel before, during and after the trial." (*Id.*, ¶ 313). Jimerson claimed that Vaughn "said that two brothers coached him into making the confession and implication. The D.A. was Tom Wynne & Robin Wynne prosecutor [*sic*]." (*Id.*, ¶ 314).

### Innocence Projects And Prescott Affidavit

On January 3, 2005, Early filled out and submitted a case evaluation form on behalf of Vaughn for the Innocence Project, without Vaughn's knowledge (*Id.*, ¶ 315). The Innocence Project later took Early on as a client (*Id.*, ¶ 316). Attorney Karen Thompson, a senior staff attorney at the Innocence Project, represented Early (*Id.*, ¶ 317). Attorney Karen Daniel, an attorney for the Center on Wrongful Convictions at the Northwestern University School of Law, represented Jimerson and later filed a petition for writ of *habeas corpus* on Jimerson's behalf (*Id.*, ¶ 318).

Gregory Stimis was retained by Thompson and to investigate the arrests and convictions of Brown, Early, Jimerson, and Vaughn (*Id.*, ¶ 319). On January 7, 2014, Stimis met with Sheriff Ford, who told Stimis about the recording made of Vaughn in jail (*Id.*, ¶ 320).

Jimerson's petition for writ of *habeas corpus* included an affidavit from Prescott stating that in March 1991 he had pending charges in Dallas County and was offered immunity by Sheriff Ford in exchange for recording a murder suspect talk about the murder while in the jail (the "Prescott Affidavit") (*Id.*, ¶ 321). In June 2014, Prescott was incarcerated at Federal Correctional Institute, Edgefield in South Carolina ("FCI Edgefield") and spoke with Daniel on the phone (*Id.*, ¶ 322). Daniel and Thompson met with Prescott at FCI Edgefield on August 11, 2014 (*Id.*, ¶ 323). Plaintiffs dispute this to the extent that Daniel met with Prescott on July 11, 2014 (*Id.*).

On that date, Prescott signed the Prescott Affidavit (*Id.*).  Prescott testified at his 2023 deposition that he did not know how to read very well in 2014 and that he did not read the Prescott Affidavit (*Id.*, ¶ 324).  On April 26, 2015, Howard signed an affidavit stating that, during the course of his representation of Jimerson, he did not learn that Prescott was encouraged to question Vaughn or that Prescott received a favorable outcome on a pending criminal charge in exchange for obtaining a statement from Vaughn (*Id.*, ¶ 325).

### Early's Affidavit

Early signed a sworn affidavit on December 21, 2015, stating that he committed the rape and murder of Holmes alone (the "Early Affidavit") (*Id.*, ¶ 326).  The Early Affidavit was typed by Thompson (*Id.*, ¶ 327).  The Early Affidavit was not Early's idea, and he did not intend to help his codefendants (*Id.*, ¶ 328).  Early testified that he had "nothing to lose" by providing the information in the Early Affidavit (*Id.*, ¶ 329).  Before speaking with legal counsel, Early believed that he would be eligible for the death penalty if he confessed to Holmes murder (*Id.*, ¶ 330).

Early has filed numerous post-conviction petitions and filed a *coram nobis* seeking a new trial in May 2021 (*Id.*, ¶ 332).

### Jimerson Evidentiary Hearing

An evidentiary hearing for Jimerson's petition for writ of *habeas corpus* was held on June 15, 2016 (*Id.*, ¶ 333).  Daniel agreed to a stipulation on Jimerson's behalf about Tom Wynne's testimony (*Id.*, ¶ 334).

At the evidentiary hearing, Prescott testified that he was given a tape recorder by Sheriff Ford, that he used it to record a confession by his cellmate, and that only Sheriff Ford took custody of the tape recorder from him (*Id.*, ¶ 335).  Prescott did not recall signing the Prescott Statement before leaving the jail, but he identified his signature on the last page (*Id.*, ¶ 336).

Sheriff Ford admitted to giving Prescott a tape recorder and asking Prescott to record any statements he could obtain from Vaughn (*Id.*, ¶ 337). Sheriff Ford testified that Prescott returned with a tape recording of a conversation with Vaughn, but he did not know what he did with the tape recording (*Id.*, ¶ 338). Sheriff Ford testified that he called Tom Wynne and told him about the recording and that Tom Wynne said they did not need the recording because Vaughn was willing to accept a plea deal and because the prosecution could not use the recording at trial (*Id.*, ¶ 339).

Howard testified that he did not recall receiving any recordings on behalf of Early and Jimerson in discovery (*Id.*, ¶ 340). Defendants claim that Howard described his office as "junky" and was not sure he found all the information from the case in his office (*Id.*, ¶ 341). Plaintiffs dispute that Howard said that he was not sure that he found all the information from the case (*Id.*). According to Plaintiffs, while Howard acknowledged that it was possible that documents may have been left out, he insisted he turned in what he found (*Id.*).

Howard was asked if he was sure if he had seen anything about Prescott in the prosecutor's file, and he responded, "I can't even be sure if I even went through their file, Jimerson's file, Reginald Early's file at their office." (*Id.*, ¶ 342). Neither Tom Wynne nor Robin Wynne testified at Jimerson's evidentiary hearing (*Id.*, ¶ 343).

### John Brown *Habeas* Proceedings

Attorneys Tricia Bushnell, Erin Cassinelli, and Rachel Wester filed a petition for writ of *habeas corpus* on Brown's behalf on December 21, 2016 (*Id.*, ¶ 344). According to Defendants, Brown's petition included declarations from Micah Moore and Rachel Price regarding conversations they had with Kenny Parsons, Lee Parsons, Ellis Tidwell, Shannon Manning, and others (*Id.*, ¶ 345).

Defendants claim that Lee Parsons had no memory of meeting with Micah Moore or Rachel Price and was not able to say what, if any, information they shared with him when they met (Dkt. No. 185, ¶ 346). He was not given the opportunity to review the statements attributed to him in the declaration included in Brown's *habeas* petition (*Id.*).

An evidentiary hearing for Brown's petition was held on September 11 and 12, 2017 (*Id.*, ¶ 348). At the hearing, Early testified that Darrell Jenkins was the only witness to testify truthfully at his criminal trial (*Id.*, ¶ 349). Kenny Parsons testified that he did not remember the period of time when Holmes was murdered or testifying in Brown's criminal trial because he was abusing drugs in 1992 (*Id.*, ¶ 350). He was using crack and "any kind of drug I could get a hold to." (*Id.*).

Lee Parsons did not remember testifying in any Holmes murder trial and did not know why he testified, but he said he did not recall Brown coming to his home with bloody clothes (*Id.*, ¶ 351). Lee Parsons stated that no one made him testify at trial (*Id.*, ¶ 352).

Ellis Tidwell testified that Investigator Earley showed him pictures and asked him to identify who came to his house with Vaughn on the night of the murder (*Id.*, ¶ 353). He viewed "a dozen or so pictures" taken from a stack at the Sheriff's Office, in the company of Investigator Earley, and possibly also Chief Poole and Sheriff Ford (*Id.*). Ellis Tidwell said that he picked out Early and Brown, whose names he did not know at the time of the line-up, and that Investigator Earley wrote on the two pictures that Ellis Tidwell chose (*Id.*, ¶ 354). Ellis Tidwell testified that, sometime after the identification, Chief Poole told Ellis Tidwell that the men he had chosen were Early and Brown (*Id.*, ¶ 355). Ellis Tidwell is deceased (*Id.*, ¶ 356).

Jeffrey testified that he had not seen the Prescott Statement at the time of the criminal trials (*Id.*, ¶ 357). Jeffrey testified that he came into the case late, "[m]aybe even a week before the first trial is when I joined the team, so to speak." (*Id.*, ¶ 358). Jeffrey testified, "I can't say what

[Murphy] did or didn't know.  I know that I didn't know," and stated that he did not know for a fact that a report about Prescott was not in the prosecutor's file (*Id.*, ¶ 359).

Manning testified that, before the April 1992 trial, he told Robin Wynne that the Manning Report contained information that he never shared, and Robin Wynne responded by telling Manning that he would not be called as a witness (*Id.*, ¶ 360).  Manning testified that he was never contacted by any defense attorney prior to the 1992 trials (*Id.*, ¶ 361).

Murphy was not called to testify at Brown's evidentiary hearing and was never contacted by any investigator (*Id.*, ¶ 362).  Neither Tom Wynne nor Robin Wynne testified at Brown's evidentiary hearing (*Id.*, ¶ 363).  Brown argued in his post-hearing brief that his trial counsel was deficient for numerous reasons (*Id.*, ¶ 364).

### *Habeas* Relief

On August 21, 2018, Brown's petition for writ of *habeas corpus* was granted (*Id.*, ¶ 365).  On September 28, 2018, Jimerson's petition for writ of *habeas corpus* was granted (*Id.*, ¶ 366).  Defendants represent that on April 29, 2020, the United States Court of Appeals for the Eighth Circuit affirmed the grants of *habeas* relief to Brown and Jimerson, finding that they each established a meritorious *Youngblood* violation (*Id.*, ¶ 367).  The Eighth Circuit reversed the district court's finding that Brown met the actual innocence gateway exception and reversed the district court's finding that Jimerson presented a timely *Brady* violation (*Id.*).

### B.   County Defendants' Statement of Undisputed Material Facts

### Sheriff Donny Ford

It is undisputed that, in September 1988, when Holmes was murdered, Sheriff Ford was not the Sheriff of Dallas County; rather, at that time he ran a furniture store in or around Fordyce,

Arkansas (Dkt. No. 206, ¶ 2).[4]  Sheriff Ford did not know Holmes (*Id.*).  Sheriff Ford ran for Sheriff of Dallas County, Arkansas, in 1990, and began as Sheriff in Dallas County in January 1991 (*Id.*, ¶ 3).  Prior to becoming Sheriff, in addition to running the furniture store, he was elected constable of a township (Southhall Township) north of Fordyce, Arkansas, and served in that role from 1986 to 1991 (*Id.*, ¶ 4).  Other than being a constable, Sheriff Ford had no prior law enforcement experience before becoming Sheriff in 1991 (*Id.*).  Generally, while constable, if a crime occurred in Southhall Township, Ford would call in the Dallas County Sheriff's Office to handle it as they had more experience (*Id.*).

After becoming Sheriff, Sheriff Ford went to a week-long "law week" training taught by an attorney for the State Police at the time (*Id.*, ¶ 5).  Sheriff Ford did not receive a certification for such attendance (*Id.*).  Sheriff Ford took additional courses after becoming Sheriff (*Id.*).

While Sheriff Ford served as Sheriff, the Dallas County Sheriff's Office did not have an investigator, and Sheriff Ford relied upon the State Police to investigate burglaries and homicides (*Id.*, ¶ 6).  Generally, the Sheriff's Office would secure a crime scene for serious violent crimes like homicides, and the State Police would take over upon their arrival and the State Police would investigate such crimes (*Id.*).

If the Sheriff's Office obtained information from a witness, it would help the witness get to the State Police for the State Police to interview (*Id.*, ¶ 7).  Although not sheriff when Holmes was murdered, Sheriff Ford understood that the State Police worked the Holmes case (*Id.*, ¶ 8).  Sheriff Ford was not involved in the investigation before becoming Sheriff and taking office in January 1991 (*Id.*).

---

[4]  Pursuant to Federal Rule of Civil Procedure 10(c), County Defendants adopt and incorporate by reference Fordyce Defendants' statement of undisputed material facts at paragraphs 1 through 367 with the exception of paragraphs 156 and 161 (Dkt. No. 190, ¶ 1; *see* Dkt. No. 185).

After retiring from being the Sheriff of Dallas County in 2015, Sheriff Ford ran for and was elected a Justice of the Peace (*Id.*, ¶ 9). Sheriff Ford recalls that Vaughn (one of the four alleged to have been involved in the murder in one way or another) pled guilty and the three remaining individuals (Jimerson, Brown, Reginald Early) went to trial (*Id.*, ¶ 10). The first trial occurred in April 1992 and ended in a mistrial; the second trial occurred in August 1992, and all three individuals were convicted (*Id.*).

During the period of 1988 through 1992, Tom Wynne was the elected prosecuting attorney for the 13th Judicial District (*Id.*, ¶ 11). Tom Wynne had deputy prosecuting attorneys working under him during that time including David Butler, Robin Wynne (Tom Wynne's brother), and Greg Parrish (*Id.*).

**Charlie Vaughn**

Vaughn is not a party to this lawsuit (*Id.*, ¶ 12). County Defendants claim that Vaughn testified that the only conversation that he had with Sheriff Ford, at the time that Vaughn was incarcerated in the Dallas County Jail after being accused of being involved in Holmes' murder, was one in which Vaughn told Sheriff Ford that Vaughn was not involved with the murder of Holmes (*Id.*, ¶ 13).

Vaughn testified that he did not know a man named Ronnie Prescott (*Id.*, ¶ 14). Vaughn also testified that he did not recall being in a cell at the Dallas County Jail with an older white male at any time (*Id.*, ¶ 15). Vaughn testified that, while in the Dallas County Jail after being accused of involvement in Holmes' murder, he never discussed the murder with any other inmate that was housed in the Dallas County Jail at that time (*Id.*, ¶ 16).

Vaughn testified that Brown was also incarcerated in the Dallas County Jail at the time that Vaughn was also incarcerated there after being accused of involvement in the murder of Holmes

(*Id.*, ¶ 17).   Vaughn testified that Brown was incarcerated in the Jail before Vaughn was incarcerated there, meaning Brown was already in the Jail when Vaughn was booked into the Jail (*Id.*).   County Defendants represent that Vaughn testified that, while both he and Brown were incarcerated in the Jail, after Vaughn was accused of involvement in the murder of Holmes, Brown told Vaughn: "Do not confess." (*Id.*, ¶ 18).

### Ronnie Prescott

Ronnie Prescott, a non-party, was in jail in Texas, and after Sheriff Ford became Sheriff, Sheriff Ford and Chief Poole went to Texas to bring Prescott back to Arkansas to face criminal drug charges (*Id.*, ¶ 19).

On August 15, 1991, Prescott testified for the State of Arkansas (represented by a deputy prosecuting attorney named David Butler, who worked for the 13th Judicial District Prosecuting Attorney's Office at that time under elected prosecutor Tom Wynne) in a prosecution against a man named Randy Bill Keeling, in *State of Arkansas v. Randy Bill Keeling*, Case No. CR 90-35 (*Id.*, ¶ 20).

This testimony, on August 15, 1991, occurred before the prosecutions of Jimerson and Brown regarding the murder of Holmes (*Id.*, ¶ 21).   Specifically, Jimerson and Brown were prosecuted in two criminal trials, one which occurred from April 20 to April 26, 1992, which ended in a hung jury, and one which occurred from August 17 through August 19, 1992, which ended in the convictions of both Jimerson and Brown (*Id.*).   Among other things, the following colloquy occurred during Prescott's testimony on August 15, 1991, in the *State v. Keeling* trial:

> **Mr. Butler** (deputy prosecutor):   Okay. Mr. Prescott, do you have charges filed against you last year and basically those charges have been *nolle prossed* against you.   Is that – the charges have not been dismissed, but actually may have been dismissed – sir, you don't have a pending case right not in this court, do you?
>
> **Mr. Prescott**:  No, Sir.

**Mr. Butler**:  All right.  Now how is it that you – you're involved in this.  How is it that you're able to get out of these charges as far as – you've done something to aid the State. Tell us what it is.

**Mr. Prescott**:  When the sheriff and Mr. Ronnie Poole came to the penitentiary in Texas to pick me up and extradite me back to the State of Arkansas, he, the sheriff, Donnie Ford, asked me if I could assist him in a brutal murder that had happened a few years back by some gentlemen of an elderly lady, and I told him if I could, I would in exchange for helping me with this.

**Mr. Butler**:  And did you do that?

**Mr. Prescott**:  Yes, sir. I did.  And I got him all the information he needed and probably more.

(*Id.*).

### The Thirteenth Judicial District Prosecuting Attorney's Office

County Defendants claim that the Thirteenth Judicial District Prosecuting Attorney's Office was aware and informed before Jimerson or Brown were ever tried for the murder of Holmes, that Prescott had provided assistance regarding the murder of Holmes, and that as a result, some charges were dropped for Prescott (*Id.*, ¶ 23).

Attorney Greg Parrish became licensed as an attorney in Arkansas in 1987 (*Id.*, ¶ 24).  After a job in Northwest Arkansas, he moved to South Arkansas and became a deputy prosecuting attorney for the Thirteenth Judicial District Prosecuting Attorney's Office in the early 1990s until 1996 when he became a public defender (*Id.*).  In 1988, Parrish became a deputy prosecutor under Tom Wynne, the elected prosecutor at that time (*Id.*).  Parrish worked with another deputy prosecutor, David Butler (who is now deceased) prosecuting cases for six counties for the Drug Task Force (*Id.*, ¶ 25).  This included Dallas County, Arkansas (*Id.*).  Parrish and Butler, both deputy prosecutors under Tom Wynne for the Thirteenth Judicial District at the time before and during the prosecutions of Jimerson and Brown, learned that Sheriff Ford made a deal with Prescott to drop the charges against Prescott if Prescott assisted in some way with respect to the

41

investigation into the murder of Myrtle Holmes (*Id.*, ¶ 26). Parrish and Butler learned this information before both prosecutions of the Plaintiffs (*Id.*).

County Defendants claim that Parrish understood that the deal involving Prescott with Sheriff Ford involved "something about a tape recording and a statement . . . ." (*Id.*, ¶ 27). County Defendants further assert that Parrish learned this information before both prosecutions of the Plaintiffs (*Id.*).

Parrish understood that Jimerson was arrested as part of the Holmes murder case because she was "supposedly driving the car that took the male[] defendants from the crime scene." (*Id.*, ¶ 28).

Prior to both criminal trials of the defendants (including Jimerson and Brown) in the Holmes murder case, both Parrish and Butler met with Sheriff Ford in the basement of the Dallas County Courthouse (*Id.*, ¶ 29). Parrish testified that Butler, also a prosecutor for the Thirteenth Judicial District, was "very upset" or "extremely upset" with Sheriff Ford for making a deal with Prescott in the Holmes case in exchange for Prescott's assistance in the obtaining a statement from Vaughn (*Id.*, ¶ 30). County Defendants claim that there is no evidence of a conspiracy between the Prosecutor's Office and Sheriff Ford; on the contrary, the Prosecutor's Office was angry with Sheriff Ford (*Id.*).

Parrish was aware that Tom Wynne and Robin Wynne were the prosecutors handling the Holmes murder case (*Id.*, ¶ 32). Parrish was aware that at least one of the Wynne brothers prosecuted the second Holmes criminal trial (*Id.*).

County Defendants claim that yet, despite knowing that Sheriff Ford made a deal with Prescott (leading to leniency for Prescott on drug charges for his assistance in the Holmes murder case) for Prescott's assistance in the Holmes case, Parrish never called or spoke in person to either

Tom Wynne or Robin Wynne about the conversation that he and Butler had with Sheriff Ford in the basement of the courthouse preceding both prosecutions of Jimerson and Brown (*Id.*, ¶ 33). Plaintiffs dispute this statement to the extent that it suggests that Parrish behaved improperly (*Id.*).

During his deposition, Parrish was posed the following question: "It's before the Keeling trial.  You're in the basement of the courthouse.  You – you know you're with Sheriff Ford and David Butler, and you learn about a deal; that Ford has cut with Ronnie Prescott.  And – and I know we've already said this. I just – I'm laying – I just want to – I'm trying to do this linearly, if – if that's a word." (*Id.*, ¶ 34).  Parrish responded and testified: "Yes."  Parrish was then asked: "is that correct?"  Parrish again reiterated: "That's correct." (*Id.*).

Hypothetically, as a criminal defense attorney, Parrish testified that if a codefendant confessed before trial but recanted at trial, he would generally see no reason to impeach that individual who recanted at trial (*Id.*, ¶ 36).  Parrish knew when he and Butler met with Sheriff Ford, before both prosecutions of Jimerson and Brown, that Sheriff Ford had made a deal with Prescott regarding something Prescott did pertaining to the Holmes murder investigation (*Id.*, ¶ 37).  Parrish testified at his deposition that he had ethical concerns with how Sheriff Ford dealt with Prescott (*Id.*, ¶ 38).  Yet, Parrish testified that he believed he should not have alerted the Wynnes (including his boss/employer the elected prosecutor Tom Wynne) about those concerns and never did alert either Tom Wynne or Robin Wynne after the meeting with Sheriff Ford (*Id.*, ¶ 39).

### Plaintiff Tina Jimerson

County Defendants represent that Jimerson encountered William "Bill" Setterman on May 20, 1989, and spoke to him about a rape allegation that Jimerson had (*Id.*, ¶ 41).  During the conversation, Setterman spoke with Jimerson about the Holmes murder (*Id.*).  Jimerson claimed

that Setterman "was very inconsiderate," about her safety or wellbeing when she spoke with him regarding a rape allegation that Jimerson made to Setterman (*Id.*). When asked why she sued Setterman's estate, she testified that "he certainly was inconsiderate" and "because he did not try to assist [ Jimerson]." (*Id.*). She meant that he did not assist her with her rape allegation (*Id.*). County Defendants claim that he allegedly told Jimerson that he would not assist her with her allegation if she could not help him with the Holmes case (*Id.*).

Before her encounter noted above with Setterman, Jimerson made a statement on April 21, 1989, to Investigator Godwin of the Arkansas State Police and Investigator John Kellam of the Fordyce Police Department (*Id.*, ¶ 42). In the statement, Jimerson indicated that she gave Vaughn a ride "up town." (*Id.*, ¶ 43). Jimerson testified that she dropped Vaughn off at a location where Brown was located (*Id.*). This occurred according to Jimerson's testimony, the night of the murder of Holmes around 6:30 p.m. (*Id.*). She and a friend went to "Bennie's house" until approximately 12:05 a.m. (midnight) that same night (*Id.*).

Additionally, the prosecutor's office sent Jimerson a letter to come in and make a statement (*Id.*, ¶ 44). Jimerson believes that occurred in April 1989 (*Id.*). Jimerson attended and made a statement (*Id.*). Jimerson testified that she was given a polygraph examination, and that prosecutors Robin Wynne and Tom Wynne were present (*Id.*). The record of the meeting notes that it occurred on June 22, 1989 (*Id.*).

County Defendants claim that, at Jimerson's meeting with prosecutors pursuant to a prosecutor's subpoena, she said regarding the Holmes murder: "I don't know nothing. I don't know nothing about this matter. All I know is seems like everything start happening when the guy had done left town." (*Id.*, ¶ 45). Jimerson was referencing Brown and said: "And what I'm saying is, if – if it was a suspicion, he should have been held here in the beginning. See, I know why I'm

so connected in it, because I was associate of John's. I was associate of John's." (*Id.*). Plaintiffs dispute this statement to the extent that it implies Jimerson was acting suspicious or that she was suspicious of Brown (*Id.*).

Jimerson testified that Sheriff Ford and Chief Poole came to her home on March 25, 1991, and that she was arrested that day (*Id.*, ¶ 46). According to County Defendants, Chief Poole testified that the arrest occurred pursuant to an arrest warrant (*Id.*). Plaintiffs dispute that Chief Poole testified that the arrest occurred pursuant to a warrant and claim that such an assertion is not supported by the record (*Id.*).

Jimerson testified that, upon being arrested, she was taken to a room upstairs in the Dallas County Courthouse (*Id.*, ¶ 47). Jimerson was later taken to the Fordyce City Jail (*Id.*). At the courthouse, on March 25, 1991, a tape recording of Vaughn was played for Jimerson by Sheriff Ford (*Id.*, ¶ 48). Jimerson recognized Vaughn's voice on the recording (*Id.*). Jimerson recalled it was a "small cassette" tape in a microcassette recorder (*Id.*).

Jimerson only recalls hearing Vaughn's voice on the recording (*Id.*, ¶ 49). Jimerson was never put in handcuffs on March 25, 1991, and was placed in the Fordyce City Jail (*Id.*, ¶ 50). Sheriff Ford did not ask Jimerson any questions; he just played the tape recording for her and read her *Miranda* rights (*Id.*, ¶ 51).

On the tape recording, Jimerson heard Vaughn confessing that he committed the murder of Holmes and implicated Jimerson as the driver of the persons who committed the murder (*Id.*, ¶ 56).

Jimerson recalled that Vaughn took the witness stand in both of her criminal trials and recanted his confession (*Id.*, ¶ 58). Chief Poole and Sheriff Ford received a warrant for Jimerson's arrest, which is what precipitated her arrest on March 25, 1991 (*Id.*, ¶ 59). Jimerson has no

personal knowledge about the circumstances around which the microcassette recording of Vaughn was recorded (*Id.*, ¶ 60).

Other than her claim that the information provided by Vaughn on the recording was allegedly not true, Jimerson has no knowledge from listening to the tape indicating that Vaughn was coerced (*Id.*, ¶ 61).

County Defendants claim that Jimerson testified that the alleged wrongs in this case about Sheriff Ford involve him coming to her home to arrest her, allegedly lying to her father, and playing the Vaughn Tape for her (*Id.*).[5]

County Defendants represent that Jimerson testified that she recalled Sheriff Ford coming into the courtroom during her first criminal trial and speaking with Robin Wynne (*Id.*, ¶ 62). Jimerson testified about that interaction:

> "I do recall when Mr. Ford came in the courtroom he stated that he had a tape that they told him that he could not use."  When asked who "they" were, she testified: "The prosecutors and the judge was aware of it."  When asked if she meant Judge Graves too she said: "Yes."

(*Id.*).  County Defendants further claim that Sheriff Ford testified that, after receiving the tape, he contacted prosecutor Tom Wynne and told him about the recording and that Tom Wynne said they did not need the recording because Vaughn was willing to accept a plea deal and because the prosecution could not use the recording at trial (*Id.*).

County Defendants claim that, as to her first trial in April 1992, Jimerson claimed she recalled "confronting all the witnesses that got up there and told those lies" specifically referencing to the best of her knowledge Bryant, Kenny Parsons, and Lee Parsons (*Id.*, ¶ 63).  Plaintiffs, with

---

[5]  The County Defendants label a paragraph "paragraph 61" twice, so the Court does the same (*see* Dkt. No. 190, ¶ 61).

citation to record evidence, dispute this to the extent that this statement suggests Jimerson ever behaved inappropriately toward a witness (*Id.*).

Jimerson testified that her criminal Howard should not have represented both her and Early (*Id.*, ¶ 64).  As to her second trial, she claimed that Howard did not represent her properly and was a failure (*Id.*).

### Plaintiff John Brown

Brown was charged with murder and rape of Holmes in March of 1990, before Sheriff Ford became the Sheriff of Dallas County, Arkansas (*Id.*, ¶ 65).  Brown was extradited to Arkansas on October 23, 1990, from Nevada after being arrested in Nevada on or about August 27, 1990, also before Sheriff Ford became the Sheriff of Dallas County, Arkansas, and before the tape recording alleged of Vaughn in the County Jail (*Id.*).

### C.    State Police Defendants' Statement Of Undisputed Material Facts

Separate defendant Garland McAnally's role in investigating the murder of Myrtle Holmes was very limited (Dkt. No. 207, ¶ 2).[6]  State Police Defendants claim that when the State Police works with a local agency, the State Police role is to help legally gain evidence and to preserve the evidence so that it can be presented in court (*Id.*, ¶ 3).

### II.    Summary Judgment Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact to be decided at trial and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The

---

[6]  Pursuant to Federal Rule of Civil Procedure 10(c), State Police Defendants adopt and incorporate by reference Fordyce Defendants' statement of undisputed material facts (Dkt. No. 193, ¶ 1; *see* Dkt. No. 185).

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."); *UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Federal Rule of Civil Procedure 56 and noting that summary judgment is proper if there is no genuine issue of material fact in dispute for trial).

Under such circumstances, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322. "In ruling on a motion for summary judgment '[t]he district court must base the determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

Parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

### III.    Fabrication Of Evidence Claims

Intentionally or recklessly failing to investigate other leads or manufacturing false evidence may shock the conscience and can violate the Fourteenth Amendment's Due Process Clause. *Livers v. Schenck*, 700 F.3d 340, 351 (8th Cir. 2012) (citing *Winslow v. Smith*, 696 F.3d 716, 731– 32 (8th Cir. 2012); *Wilson v. Lawrence Cnty.*, 260 F.3d 946, 955–57 (8th Cir. 2001)).  "[A] manufactured false evidence claim requires proof that investigators deliberately fabricated evidence in order to frame a criminal defendant."  *Winslow*, 696 F.3d at 732.  "Negligence and even gross negligence is not enough" to establish that evidence was fabricated.  *Livers*, 700 F.3d at 351.

Separate plaintiff Jimerson alleges that "Defendant Investigators (1) fabricated false inculpatory police reports and statements from Charlie Vaughn and from the remaining witnesses who testified against [Jimerson]; [and] (2) concealed all evidence of their fabrication by failing to document their activities and preparing false reports . . . ." (Dkt. No. 83, ¶ 88).  Separate plaintiff Thompson alleges that "Investigator Defendants": (1) fabricated false inculpatory police reports and statements from Charlie Vaughn, Ronnie Prescott, Lee Parsons, Kenny Parsons, and Ellis Tidwell; [and] (2) concealed all evidence of their fabrication by failing to document their activities and preparing false reports . . . ." (Case No. 4:20-cv-1155, Dkt. No. 42, ¶ 117).  Jimerson does not define "Defendant Investigators," nor does Thompson define "Investigator Defendants."  The Court construes these terms to include all separate defendants, all of whom were employed as police officers or investigators.  The Court addresses Plaintiffs' fabrication of evidence claims with respect to each defendant in turn.

### A.    Fordyce Defendants' Alleged Fabrication Of Evidence

#### 1.    Separate Defendant Chief Poole

Plaintiffs appear to allege that Chief Poole fabricated evidence with respect to the testimony of one witness, Lee Parsons (Dkt. No. 210, at 47).  Specifically, Plaintiffs allege that "Lee Parsons testified that Poole told him what he was required to say." (*Id.*).  Fordyce Defendants claim that that there is no competent evidence that Lee Parsons' March 27, 1991, statement was a deliberate fabrication (Dkt. No. 184, at 17).

#### a.    Claim:  Lee Parsons' Testimony

The record reflects that, on March 27, 1991, Lee Parsons was interviewed by Sheriff Ford and Jessie Dean Brandon of the Dallas County Sheriff's Office (Dkt. No. 205, ¶ 203).  During that interview, Lee Parsons said that Brown came to his house bloody and that "Teen" brought him there (*Id.*).  Sheriff Ford clarifies that "Teen" was Jimerson (*Id.*).  The report of the interview was transcribed by Investigator Godwin (*Id.*).  Lee Parsons then testified, consistent with this initial statement that he gave on March 27, 1991, at Plaintiffs' April 1992 and August 1992 criminal trials (*Id.*, ¶¶ 249, 281).

Plaintiffs, relying on Lee Parsons' 2023 deposition testimony, claim that Lee Parsons' 1991 statement and 1992 trial testimony are not true (Dkt. No. 210, at 41–42).  During his 2023 deposition, Lee Parsons claimed that, when he was questioned about the Holmes murder a few weeks after it occurred, the police "put words in [his] mouth," and according to Lee Parsons, the police stated that they would put him in jail if he did not say what they instructed him to say (Dkt. No. 209-28, at 10).  Lee Parsons testified that the police officers instructed him to say that Brown was staying with Lee Parsons and that he saw Brown wearing bloody clothes the night of Holmes'

murder (*Id.*).  Lee Parsons claimed that he believed it was Chief Poole who instructed him on what to say he witnessed on the night of the murder (*Id.*).

Fordyce Defendants claim that Lee Parsons' admitted confusion and past drug use indicate that he is an unreliable witness, and his testimony is contradicted by the record (Dkt. No. 220, at 13–16).

However, the Court finds that the tension with Lee Parsons' testimony goes to witness credibility, and "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions."  *Thomas v. Heartland Emp. Servs. LLC*, 797 F.3d 527, 530 (8th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).  Therefore, the Court finds that on the record before it, taking all reasonable inferences in favor of the nonmoving party, Plaintiffs, there is a dispute of material fact as to whether Chief Poole fabricated Lee Parsons' testimony that was given during Plaintiffs' 1992 criminal trials.  The Court denies Fordyce Defendants' motion for summary judgement on Plaintiffs' fabrication of evidence claims with respect to separate defendant Chief Poole as it relates to the Lee Parsons' testimony (Dkt. No. 184).

### b.    Qualified Immunity:  Separate Defendant Chief Poole

Individuals sued under § 1983 in their individual capacities can raise qualified immunity as a defense.  This doctrine "shields a government official from liability in a § 1983 action unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known."  *Partlow v. Stadler*, 774 F.3d 497, 501 (8th Cir. 2014).  "To determine whether [an official] is entitled to qualified immunity, [the court] must consider, in either order, two questions: (1) whether the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) whether the right was

clearly established at the time of the deprivation." *Willis v. Mills*, 141 F.4th 905, 911 (8th Cir. 2025) (quotations omitted).

Plaintiffs sue Chief Poole in his individual and official capacities (Dkt. No. 83, ¶ 20). Fordyce Defendants claim that they are entitled to qualified immunity (Dkt. No. 184, at 42). Given that the Court finds that, on this record, there are disputes of material fact as to whether Chief Poole violated Plaintiffs' Fourteenth Amendment rights by fabricating evidence, the Court proceeds to the second prong of the qualified immunity analysis. At the time that the alleged fabrication occurred in 1990, it was clearly established that it was unlawful to use fabricated evidence to secure a conviction. *See Napue v. People of State of Illinois*, 360 U.S. 264, 272 (1959) (noting that "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction" is "implicit in any concept of ordered liberty.").

This Court views the record evidence in the light most favorable to Plaintiffs, the nonmoving party. A reasonable jury could determine that Plaintiffs' account of the facts is true, and if Plaintiffs' account of the facts is true, then Chief Poole is not entitled to qualified immunity on Plaintiffs' fabrication of evidence claims (Dkt. No. 184).

### 2.    Separate Defendant Investigator Case

Plaintiffs appear to allege that separate defendant Investigator Case conspired with separate defendant Investigator Godwin and fabricated the report of the interview of Shannon Manning (Dkt. No. 210, at 52). Fordyce Defendants claim that there is no record evidence that any Fordyce Defendant was involved in any statement attributed to Manning (Dkt. No. 184, at 19).

The Court is unpersuaded by Fordyce Defendants' claims that the record does not reflect that Investigator Case was involved with procuring Manning's statement. The record reflects that, on March 5, 1990, Investigator Case and Investigator Godwin interviewed Manning at Skyline

High School in Oakland, California (Dkt. No. 205, ¶ 93). Investigator Godwin authored the ASP report of the March 5, 1990, interview (the "Manning Report") (*Id.*, ¶ 94). According to the Manning Report, Manning said that Early "ran with" a group including Brown and Vaughn (Dkt. No. 209-4, at 191–92). In the report, Manning also said that Early "always hung around with John Brown until John Brown and Reginald Early got in a fight in the Mill Quarters because one of them had said the other had killed Mrs. Holmes" and that Jimerson was present for this fight (*Id.*, at 191). The Manning Report lists that Investigator Case was present with Investigator Godwin, which makes the fact as to whether Investigator Case was involved with the Manning Report a disputed issue of material fact that is a triable issue for the jury to decide (Dkt. No. 209-4, at 191–92).

Moving onto whether the statement itself was fabricated, Plaintiffs dispute that Manning provided the information contained in the statement and point to Manning's deposition in which he testified that the Manning Report is a fabrication (Dkt. Nos. 205, ¶¶ 97–98; 209, ¶ 72). Manning testified that he remembered being interviewed by Investigator Case and Investigator Godwin but claimed that he did not remember signing a statement, nor did he say anything to the police that the statement reflects that he said (Dkt. No. 209-27, at 30–42). Taking all reasonable inferences in favor of the nonmoving party, Plaintiffs, a reasonable jury could conclude that the Manning Report was fabricated.

Fordyce Defendants claim that, even if the statement was attributed to Investigator Case, there is no evidence that Manning's statement was used to secure Plaintiffs' convictions. "[A] manufactured false evidence claim requires proof that investigators deliberately fabricated evidence in order to frame a criminal defendant." *Winslow*, 696 F.3d at 732 (citing *Whitlock v. Brueggemann*, 682 F.3d 567, 585 (7th Cir. 2012) (en banc); *Devereaux v. Abbey*, 263 F.3d 1070,

53

1076–77 (9th Cir. 2001) (en banc)).  The record reflects that Manning testified that he informed prosecutor Tom Wynne that the Manning Report contained information that Manning did not say (Dkt. No. 184-48, at 362–63).  In response, Tom Wynne told Manning that he would not call him as a witness (*Id.*).

Based upon the undisputed record evidence, no reasonable jury could conclude that the alleged fabricated evidence, the Manning Report, was used by the prosecution to secure Plaintiffs' convictions.  Thus, the Court grants Fordyce Defendants' motion for summary judgment as to Plaintiff's fabrication of evidence claims against Investigator Case (Dkt. No. 184).

### 3.    City Of Fordyce Municipal Liability

Having concluded that, from the record evidence with all reasonable inferences drawn in favor of Plaintiffs, a reasonable jury could conclude that Chief Poole fabricated evidence in violation of the Fourteenth Amendment and that genuine issues of material fact are in dispute and remain for trial, the Court next turns to whether the City of Fordyce can be held liable for Chief Poole's actions.  The Supreme Court has held that a municipal government cannot be held liable under 42 U.S.C. § 1983 solely for the actions of its employees.  *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691–92 (1978).  The municipality can only be held liable for its own unconstitutional policies or customs.  *Id.* at 694.  Thus, for § 1983 liability to attach to a municipality, there must be an official municipal policy giving rise to the violation, and "absent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City." *Whitney*, 887 F.3d at 861 (citing *Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017); *Sitzes v. City of W. Memphis Ark.*, 606 F.3d 461, 470 (8th Cir. 2010); *Sanders v. City of Minneapolis*, 474 F.3d 523, 527 (8th Cir. 2007)).

"A plaintiff may establish municipal liability under § 1983 by proving that his or her constitutional rights were violated by an action pursuant to official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or usage with the force of law." *Mitchell v. Kirchmeier*, 28 F.4th 888, 899 (8th Cir. 2022) (internal quotation marks omitted) (quoting *Ware v. Jackson Cnty.*, 150 F.3d 873, 880 (8th Cir. 1998)). "Policy and custom are not the same thing" under *Monell*. *Corwin v. City of Indep.*, 829 F.3d 695, 699–700 (8th Cir. 2016).

> To show a custom or usage, the plaintiff must prove (1) [t]he existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) [d]eliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) an injury by acts pursuant to the governmental entity's custom.

*Mitchell*, 28 F.4th at 899 (internal quotation marks omitted).

"[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (citing *Ware*, 150 F.3d at 880). "Municipal policies include actions by its legislative body, and decisions or actions by employees who possess[ ] final authority to establish municipal policy with respect to the action ordered." *Lipsky v. Cronin, et al.*, Case No. 5:22-cv-05039, 2025 WL 969222 (D. S. D. March 31, 2025) (internal citations and quotation marks omitted). Moreover, to establish municipal liability, there must be a "direct causal link between" the policy or custom and the alleged constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). In other words, the plaintiff bears the burden to demonstrate that the policy or custom was the "moving force" behind the alleged constitutional violation. *Monell*, 436 U.S. at 694.

Separate plaintiff Jimerson alleges that the City of Fordyce's policies were the moving force behind the violation of Jimerson's constitutional rights, Chief Poole was the final policymaker for the City of Fordyce, and therefore, the City of Fordyce is liable (Dkt. No. 83, ¶¶ 75, 92). Similarly, Thompson alleges that the City of Fordyce's policies were the moving force behind violations of Brown's constitutional rights (Case No. 4:20-cv-1155, Dkt. No. 42, ¶ 121). Fordyce Defendants claim that, as chief of police for the City of Fordyce, Chief Poole was not a final policymaker (Dkt. No. 184, at 41). Plaintiffs claim that, even though Chief Poole served "at the pleasure of the mayor," Chief Poole testified that he retained control over his day-to-day operations and Plaintiffs claim that Chief Poole should therefore be considered the final policymaker (Dkt. No. 210, at 64).

"Whether an official had final policymaking authority is a question of state law." *Copeland v. Locke*, 613 F.3d 875, 882 (8th Cir. 2010) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986); *see McMillian v. Monroe County, Ala.*, 520 U.S. 781, 786 (1997) ("our inquiry [as to policymaker status] is dependent on an analysis of state law." Under Arkansas law, Chief Poole was not a final policymaker. This Court has previously held that "a chief of police for a first class city . . . is not a final policymaker under Arkansas law because he is under the direction of a mayor, who has final authority when official police policy is made." *Williams v. City of Alexander*, Case No. 4:12-cv-00187 KGB, 2013 WL 5970686 (E.D. Ark. Nov. 8, 2013), *aff'd in part, dismissed in part*, 772 F.3d 1307 (8th Cir. 2014) (citing *S.S. ex rel. A.S. v. Bono Police Dep't*, Case No. 3:07-cv-00124-WRW, 2008 WL 4493065 (E.D. Ark. Oct. 1, 2008); Ark. Code Ann. § 14-52-203). Here, Chief Poole's duty as the chief of police of the City of Fordyce was "under the direction of the mayor." (Dkt. No. 209-16, at 17). *See* Ark. Code Ann. § 14-52-203(a). Importantly, in 1988 when the Holmes murder occurred, Fordyce was a first class city, and the chief of police was

appointed by the mayor (*Id.*). Therefore, the Court finds that, because Chief Poole served as chief of police for a first-class city under Arkansas law, was appointed by the mayor, and served at the pleasure of the mayor, Chief Poole was not a final policymaker for the City of Fordyce.

On the record before the Court with all reasonable inferences drawn in Plaintiffs' favor, the Court finds that there is no genuine issue of material fact in dispute as to whether Chief Poole was a final policymaker for the City of Fordyce, which would subject the City of Fordyce to liability for Chief Poole's conduct. Because Poole was not a final policymaker for the City of Fordyce, there can be no *Monell* liability under this claim. The Court grants Fordyce Defendants' motion for summary judgement as to the City of Fordyce on Plaintiffs' fabrication of evidence claims (Dkt. No. 184).

### B.    County Defendants' Alleged Fabrication Of Evidence

Throughout separate Plaintiff Jimerson's complaint, Jimerson references "Defendant Investigators" but does not appear to define this term (*See Generally* Dkt. No. 83). Similarly, separate plaintiff Thompson references "Investigator Defendants" but does not appear to define this term (*See Generally*, Case No. 4:20-cv-1155, Dkt. No. 42.). The Court construes this term to include all separate defendants, all of whom were employed as police officers or investigators. However, Plaintiffs do not put forth any specific allegations that any County Defendant fabricated evidence in violation of Plaintiffs' Fourteenth Amendment rights (*See* Dkt. No. 210, at 45–47). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). Each government official is only liable for his or her own misconduct. *Id.* at 677. Therefore, because Plaintiffs did not plead any specific allegations, and have not come forward with record evidence, regarding how County Defendants

allegedly fabricated evidence, there is not an issue of triable fact as to whether County Defendants fabricated evidence. Thus, the Court grants County Defendants' motion for summary judgment as to Plaintiffs' fabrication of evidence claims (Dkt. No. 189).

### C.    State Police Defendants' Alleged Fabrication Of Evidence

#### 1.    Separate Defendant Lieutenant Bradshaw

Plaintiffs do not appear to make any specific allegations that Lieutenant Bradshaw fabricated any evidence in violation of Plaintiffs' Fourteenth Amendment rights as required under § 1983. *See Iqbal,* 556 U.S. at 676. Therefore, the Court grants State Police Defendants' motion for summary judgment as to Plaintiffs' claims that Lieutenant Bradshaw fabricated evidence (Dkt. No. 192).

#### 2.    Separate Defendant Investigator Godwin

Plaintiffs appear to allege that Investigator Godwin fabricated evidence relating to the interview of Manning as documented in the Manning Report (Dkt. No. 210, at 50, 53). State Police Defendants claim that there is no evidence that any of the State Police Defendants knew that Manning provided false statements; the State Police Defendants documented Manning's interview; and Manning did not testify at Plaintiffs' criminal trials (Dkt. No 194, at 4). As discussed with respect to separate defendant Investigator Case's alleged fabrication of evidence, the record reflects that on March 5, 1990, Investigator Case and Investigator Godwin interviewed Manning at Skyline High School in Oakland, California, and Investigator Godwin authored the ASP report of the March 5, 1990, interview, which Manning later testified contained false statements attributed to him (Dkt. No. 205, ¶¶ 93–94, ¶¶ 97–98; 209, ¶ 72; 209-27, at 30–42). Therefore, based on the record before it, the Court concludes that a reasonable jury, taking all inferences in favor of Plaintiffs, could conclude that the Manning Report was fabricated, and thus, there is a

disputed issue of material fact that is a triable issue for the jury to decide whether Investigator Godwin fabricated evidence in violation of Plaintiffs' Fourteenth Amendment rights.

However, the record is void of evidence that Manning's statement was used to secure Plaintiffs' convictions as required by Eighth Circuit law. *See Winslow*, 696 F.3d at 732 (citing *Whitlock*, 682 F.3d at 585 (en banc); *Devereaux*, 263 F.3d at 1076–77 (9th Cir. 2001) (en banc)). The record reflects that Manning informed the prosecutor, Tom Wynne, that the Manning Report was false, and as a result, Tom Wynne told Manning that he would not be called to testify in Plaintiffs' criminal trial (Dkt. No. 184-48, at 362–63). There is no record evidence that Manning testified at that trial.

For these reasons, no reasonable jury could conclude that the alleged fabricated Manning Report was used to secure Plaintiffs' convictions. There is not a triable issue of material fact as to whether the claim that Investigator Godwin fabricated evidence can proceed. The Court grants State Police Defendants' motion for summary judgment as to Plaintiffs' claim that Investigator Godwin fabricated evidence in violation of Plaintiffs' Fourteenth Amendment rights (Dkt. No. 192).

## IV.    Destruction Of Evidence Claims

The bad faith "failure to preserve potentially useful evidence" can constitute the denial of an individual's due process rights. *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n. *. Separate plaintiff Jimerson alleges that "Defendant Investigators" destroyed evidence that was "material and exculpatory" in violation of Plaintiffs' Fourteenth Amendment right to due process (Dkt. No. 83, ¶ 88). Similarly, separate plaintiff Thompson

alleges that "Investigator Defendants" "destroyed evidence that was material and exculpatory." (Case No. 4:20-cv-1155, Dkt. No. 42, ¶ 117).  The Court will analyze Plaintiffs' destruction of evidence claims against each separate defendant in turn.

### A.    Issue Preclusion

Before turning to Plaintiffs' destruction of evidence claims, the Court first addresses whether such claims are precluded by the Eighth Circuit's decision in *Jimerson v. Payne*, 957 F.3d 916, 929–30 (8th Cir. 2020), in which the Eighth Circuit found that Plaintiffs had alleged meritorious *Youngblood* claims against the prosecutors and investigators who allegedly fabricated evidence.  Issue preclusion, also known as collateral estoppel, provides that "when an issue of ultimate fact has been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in another lawsuit."  *Anderson v. Genuine Parts Co.*, 128 F.3d 1267, 1272–73 (8th Cir. 1997) (quoting *United States v. Brekke*, 97 F.3d 1043, 1049 (8th Cir. 1996), *cert. denied*, 520 U.S. 1132 (1997)).  To determine whether an issue is precluded, courts consider that:

> (1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit;
>
> (2) the issue sought to be precluded must be the same as the issue involved in the prior action;
>
> (3) the issue sought to be precluded must have been actually litigated in the prior action;
>
> (4) the issue sought to be precluded must have been determined by a valid and final judgment; and
>
> (5) the determination in the prior action must have been essential to the prior judgment.

*Id.* (citing *Tyus v. Schoemehl*, 93 F.3d 449 (8th Cir. 1996), *cert. denied*, 520 U.S. 1166 (1997), *abrogated on other grounds by Taylor v. Sturgell*, 553 U.S. 880 (2008)).

Here, several of the factors are met.  Namely, the same issue was involved in the prior action; the issue sought to be precluded was determined by a valid and final judgment, and the determination in the prior action was essential to the prior judgment.  *See Jimerson*, 957 F.3d at 929–30.  However, this prior action and the current action involve different parties.  Plaintiffs' first suit was a petition for a writ of *habeas corpus*, and in that action, the defendant was the director of the ADC.  *Id*.  Although Sheriff Ford's actions relating to his involvement with securing the recorded conversation between Vaughn and Prescott, the informant placed in Vaughn's cell with the intent to obtain information relating to Holmes' murder, were at issue in the case before the Eighth Circuit, Sheriff Ford was not a party to the prior action, nor was Sheriff Ford in privity with the defendant in that action, the director of the ADC.  *See id*.  Essentially, the defendants were "strangers" to the earlier judgment and, therefore, cannot be bound by that judgment.  *See S. Cent. Bell Tel. Co. v. Alabama*, 526 U.S. 160, 161(1999); *see also Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 331–32 (1979) (limiting offensive collateral estoppel for fairness concerns when defendant in current litigation was not involved in prior).  Therefore, the Court finds that the prior judgment which determined that Plaintiffs' destruction of evidence claims were meritorious does not preclude or conclusively resolve Plaintiffs' destruction of evidence claims in this current matter.

### B.     Fordyce Defendants' Alleged Destruction Of Evidence

### 1.     Separate Defendant Chief Poole

Fordyce Defendants move for summary judgment on Plaintiffs' destruction of evidence claims for two reasons.  First, Fordyce Defendants assert that Plaintiffs are unable to show that any Fordyce Defendant had any knowledge of the fact that the Prescott Tape was not preserved in bad faith (Dkt. No. 184, at 21).  According to Fordyce Defendants, Sheriff Ford procured the

Prescott Tape without the assistance of law enforcement and was the sole custodian of the Prescott Tape (*Id.*, at 21–22). However, the undisputed record evidence reflects that Chief Poole was involved.

### a.    Claim:  Prescott Tape

Chief Poole accompanied Sheriff Ford to Texas to pick up Prescott, and Chief Poole was present in the car while Sheriff Ford made a deal with Prescott that his pending charges would be dismissed if he wore a recorder and engaged Vaughn in a conversation about the Holmes murder (Dkt. No. 205, ¶ 151–52).  The extent to which Chief Poole engaged in conversation with Prescott about acting as an informant and seeking out information from Vaughn is disputed.  Chief Poole testified that, during the car ride from Texas, he "told Ronnie Prescott that he would be in jail with [Vaughn] who had been talking about a murder and that [Sheriff Ford and Chief Poole] wanted to hear anything that [Prescott] could overhear that [Vaughn] would say." (Dkt. No. 185-10, at 275).  Chief Poole further testified that he told Prescott, "[W]hen you go in, do not engage with [Vaughn], do not talk to this man.  If he comes and talks to you, you listen and report and, if possible, record anything that he says to you." (*Id.*).  Therefore, the record evidence reflects that, at the very least, Chief Poole aided Sheriff Ford in striking the deal with Prescott that resulted in the Prescott Tape.

While the record reflects, as discussed below, that Sheriff Ford had the recorded tape, an individual can be liable for a *Youngblood* violation "if the officer fails to disclose or preserve potentially exculpatory evidence in bad faith." *Briscoe v. Cnty. of St. Louis, Missouri*, 690 F.3d 1004, 1013 (8th Cir. 2012) (citing *Villasana v. Wilhoit*, 368 F.3d 976, 980 (8th Cir. 2004)).  As discussed above, record evidence indicates that Chief Poole participated in making the agreement for Prescott to wear a tape recorder and engage Vaughn in a conversation about the Holmes murder.  After the Prescott Tape was made, Sheriff Ford called Chief Poole and told him that

Prescott secured the recorded statement of Vaughn discussing the murder, and Chief Poole then went to the sheriff's office and listened to the Prescott Tape (Dkt. No. 185-10, at 285). Chief Poole explained that, on the tape, "Charlie Vaughn provided great detail in how the event unfolded and what each of the actors did and what they did afterwards." (*Id.*, at 285–86).

Despite Chief Poole's participation in getting Prescott to agree to secretly record a conversation with Vaughn about the Holmes murder and Chief Poole's knowledge of the existence of the Prescott Tape, record evidence at this stage indicates that Chief Poole did not document the existence of the tape (*Id.*, at 309). Chief Poole testified that he was "surprised" that he did not document the existence of the Prescott Tape or its content because Chief Poole should have documented it (*Id.*, at 310–11).

Therefore, on the record before it, with all reasonable inferences drawn in Plaintiffs' favor, there are triable issues of material fact to the destruction of evidence claim against Chief Poole. First, there is a triable issue of material fact as to whether Chief Poole failed to disclose the Prescott Tape given that Chief Poole participated in striking the deal that led to the procurement of the tape. Second, there is a triable issue of material fact as to whether Chief Poole's failure to document the existence of the aforementioned deal or the Prescott Tape.

Second, Fordyce Defendants claim that, even if the Court finds that Fordyce Defendants are connected to the failure to disclose or the destruction of the Prescott Tape, the evidence is immaterial (Dkt. No. 184, at 22). Evidence of bad faith turns on the law enforcement officer's "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n. *. Material evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California v.*

*Trombetta*, 467 U.S. 479, 489 (1984). Fordyce Defendants point to Prescott's testimony that his handwritten statement contains the same details as the Prescott Tape and Jimerson's testimony that she heard a recording of Vaughn in which Vaughn implicated her as the driver (Dkt. No. 184, at 22).

The handwritten statement was written by Lieutenant Bradshaw, signed by Prescott, and witnessed by Chief Poole (Dkt. No. 209-19). The statement does not mention the Prescott Tape or the deal that Prescott made with Sheriff Ford and Chief Poole (*Id.*). Moreover, the record reflects that there is another recording of Vaughn, his taped confession which is different from the Prescott Tape, and Jimerson does not specify to which recording she listened (*See* Dkt. No. 205, ¶¶ 180–81). Based on the discrepancies in the record evidence, the contents of the Prescott Tape are unclear.

Regarding the materiality of the Prescott Tape, as the Eighth Circuit put it:

Without the recording, we cannot ascertain its significance. We do not know what Prescott said to Vaughn to elicit the confession. We do not know if Prescott suggested details to Vaughn. We do not know if the recorded confession was consistent with the in-court confession. We do not know if Vaughn reluctantly and nervously confessed and implicated others, or if he willingly and confidently confessed and implicated others. It could be that the recording was merely cumulative and corroborative of Vaughn's in-court statements. It could be that the recording demonstrated Vaughn was coerced or influenced to implicate others out of fear that he would be put to death if convicted.

*Jimerson v. Payne*, 957 F.3d at 926.

Because the Prescott Tape no longer exists, the Court cannot determine at this stage whether it was material. Whether the Prescott Tape contained material evidence is a fact question for the jury to decide.

The Court finds that the omission of any mention of the Prescott Tape in the handwritten statement prepared by Lieutenant Bradshaw and witnessed by Chief Poole, coupled with the failure

to disclose the existence of the Prescott Tape, could lead a reasonable jury to conclude that the failure to disclose such evidence was done in bad faith. Therefore, the Court denies Fordyce Defendants' motion for summary judgment with respect to Plaintiffs' destruction of evidence claims against Chief Poole (Dkt. No. 184).

### b.    Qualified Immunity:  Separate Defendant Chief Poole

Having established that a reasonable jury could conclude that Chief Poole violated Plaintiffs' Fourteenth Amendment rights by failing to disclose material evidence, the Court now determines whether Chief Poole is entitled to qualified immunity and thus shielded from liability for his purportedly unconstitutional actions. *See Partlow*, 774 F.3d at 501. To do so, the Court considers: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.*; *see Willis* 141 F.4th at 911. As discussed above, the first prong of this analysis is met because a reasonable jury could conclude that Chief Poole violated Plaintiffs' constitutional rights by failing to disclose the existence of the Prescott Tape. The second prong of the analysis is also met because, at the time that the Prescott Tape was procured in March 1991 (Dkt. Nos. 205, ¶¶ 154–55), it was clearly established that the bad faith "failure to preserve potentially useful evidence" could constitute the denial of an individual's due process rights. *Youngblood*, 488 U.S. at 58.

This Court views the record evidence in the light most favorable to Plaintiffs, the nonmoving party. A reasonable jury could determine that Plaintiffs' account of the facts is true, and if Plaintiffs' account of the facts is true, then Chief Poole is not entitled to qualified immunity on Plaintiffs' destruction of evidence claim.

### 2.    Separate Defendant Investigator Case

Plaintiffs do not appear to make any specific allegations that Investigator Case destroyed any evidence in violation of Plaintiffs' Fourteenth Amendment rights as required under § 1983. *See Iqbal,* 556 U.S. at 676.  Therefore, the Court grants Fordyce Defendants' motion for summary judgment as to Plaintiffs' claims that Investigator Case destroyed evidence (Dkt. No. 184).

### 3.    City Of Fordyce Municipal Liability

Having concluded that, from the record evidence with all reasonable inferences drawn in favor of Plaintiffs, a reasonable jury could conclude that Chief Poole failed to disclose material evidence in violation of the Fourteenth Amendment and that genuine issues of material fact are in dispute and remain for trial, the Court next turns to whether the City of Fordyce can be held liable for Chief Poole's actions.  For the same reasons as discussed above, because Chief Poole, who was chief of police when the alleged constitutional violations occurred, was not a final policymaker under Arkansas law, the City of Fordyce cannot be held liable for Chief Poole's actions given the lack of an official, custom, policy, or actions on behalf of a policymaker, who caused said constitutional violations.  *See Williams*, 2013 WL 5970686, at *10 (citing *Bono Police Dep't*, 2008 WL 4493065; Ark. Code Ann. § 14-52-203).  Therefore, the Court grants Fordyce Defendants' motion for summary judgment as to Plaintiffs' *Monell* liability claims against the City of Fordyce for Chief Poole's alleged destruction of evidence.

### C.    County Defendants' Alleged Destruction Of Evidence

### 1.    Separate Defendant Sheriff Ford

County Defendants move for summary judgment on Plaintiffs' destruction of evidence claims (Dkt. No. 191, at 6–13).  Plaintiffs claim that a reasonable jury could find that Sheriff Ford

violated Plaintiffs' right to a fair trial by destroying the tape recording of Prescott's conversation with Vaughn (Dkt. No. 210, at 19).

### a.    Claim:  Prescott Tape

An individual's Fourteenth Amendment Due Process rights are violated when an officer "fails to disclose or preserve potentially exculpatory evidence in bad faith." *Briscoe*, 690 F.3d at 1013 (citing *Villasana*, 368 F.3d at 980).  Evidence of bad faith turns on the law enforcement officer's "knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n. *.

Here, the record evidence construed in the light most favorable to Plaintiffs reflects that on March 22, 1991, Prescott was placed in a cell with Vaughn with a concealed tape recorder at the direction of Sheriff Ford (Dkt. No. 205, ¶¶ 151, 154).  Prescott recorded his conversation with Vaughn, and then Prescott returned the recorder to Sheriff Ford after holding it overnight (*Id.*, ¶ 155).  It is undisputed that then on March 24, 1991, Lieutenant Bradshaw interviewed Prescott about Vaughn's recorded confession; Sheriff Ford and Vaughn's attorney, Remet, were present (Dkt. No. 205, ¶¶ 157–58).  Then the next day, on March 25, 1991, Vaughn pled guilty in open court to the murder of Holmes and implicated Plaintiffs (Dkt. No. 205, ¶¶ 184–85).  After receiving the Prescott Tape from Prescott, Sheriff Ford put the tape in his desk drawer where it remained for the remainder of 1991; at some point, Sheriff Ford took the tape out of his desk drawer and recorded over it (Dkt. No. 185-16, at 139–57).  Sheriff Ford admits that he never prepared a report documenting the existence of the tape, nor did Sheriff Ford share the existence of the tape with Vaughn's attorney, Remet (*Id.*, at 157).

County Defendants claim that the Prescott Tape was not used to prosecute or even arrest Plaintiffs; however, the record reflects, as detailed above, that Vaughn plead guilty in open court

to Judge Graves and implicated Plaintiffs just one day after Prescott was interviewed about the conversation he recorded of Vaughn (*See* Dkt. No. 205, ¶ 185).  Plaintiffs assert that this timeline, coupled with the fact that Sheriff Ford failed to preserve or at a minimum document the existence of the tape, could lead a reasonable jury to conclude that Sheriff Ford destroyed the evidence in bad faith.

County Defendants further claim that Jimerson knew of the Prescott Tape, and according to County Defendants, Jimerson testified that nothing in the recording was exculpatory (Dkt. No. 191, at 10).  Plaintiffs admit that Jimerson did testify at her deposition that, on the day of her arrest, she was played a tape of Vaughn implicating Jimerson in the Holmes murder (Dkt. No. 210, at 25).  However, Plaintiffs dispute whether the tape she was played was the Prescott Tape because the record reflects that there is more than one audio tape of Vaughn confessing (*Id.*).  The Court agrees with Plaintiffs.  The record reflects that there are two recorded audio tapes of Vaughn.  The first tape is the tape at issue here, the Prescott Tape, which was procured on March 24, 1991 (Dkt. No. 205, ¶¶ 154–57).  The second tape bearing Vaughn's voice is Vaughn's taped confession, which was procured on March 24, 1991 (*Id.*, ¶¶ 180–81).  Importantly, Jimerson was arrested on March 25, 1991, after both the Prescott Tape and Vaughn's recorded confession were procured (*Id.*, ¶ 195; Dkt. No. 185-5, at 169).  Which tape recording of Vaughn that Jimerson heard the day of her arrest is a fact question for the jury to determine.  Further, as discussed previously, what the Prescott Tape contained, and whether its contents were exculpatory evidence, are also fact questions for the jury to decide.

Based on the record before it with all reasonable inferences drawn in favor of Plaintiffs, the Court finds that a reasonable jury could conclude that Sheriff Ford destroyed the evidence in bad faith, and there is a triable issue of material fact as to whether Jimerson heard the Prescott

Tape.  Therefore, the Court denies County Defendants' motion for summary judgment with respect to Plaintiffs' destruction of evidence claims against Sheriff Ford.

### b.    Qualified Immunity:  Separate Defendant Sheriff Ford

Next the Court turns to whether Sheriff Ford is afforded qualified immunity on Plaintiffs' destruction of evidence claims.  The qualified immunity analysis requires courts to consider whether a constitutional right was violated and whether such a right was clearly established at the time of the alleged violation.  *See Partlow*, 774 F.3d at 501; *Willis* 141 F.4th at 911.  For the reasons stated above, the first prong of the qualified immunity analysis is met because a reasonable jury could conclude that Sheriff Ford destroyed the evidence in bad faith.  The second prong is also met because at the time that the Prescott Tape was procured in March 1991 (Dkt. Nos. 205, ¶¶ 154–55), it was clearly established that the bad faith "failure to preserve potentially useful evidence" can constitute a denial of an individual's due process.  *Youngblood*, 488 U.S. at 58. Because a reasonable jury could conclude that Sheriff Ford violated Plaintiffs' constitutional rights that were clearly established at the time of the alleged violation, the Court finds that Sheriff Ford is not entitled to qualified immunity on Plaintiffs' destruction of evidence claim.

### 2.    Separate Defendant Setterman

Plaintiffs do not appear to make any specific allegations that Setterman destroyed any evidence in violation of Plaintiffs' Fourteenth Amendment rights as required under 42 U.S.C. § 1983.  *See Iqbal,* 556 U.S. at 676.  Therefore, the Court grants County Defendants' motion for summary judgment as to Plaintiffs' claims that Setterman destroyed evidence (Dkt. No. 189).

### 3.    Dallas County Municipal Liability

Having concluded that, from the record evidence with all reasonable inferences drawn in favor of Plaintiffs, a reasonable jury could conclude that Sheriff Ford failed to preserve or disclose

material evidence in violation of the Fourteenth Amendment and that genuine issues of material fact are in dispute and remain for trial, the Court next turns to whether Dallas County can be held liable for Sheriff Ford's purported actions.

For § 1983 liability to attach to a municipality, there must be an official municipal policy giving rise to the violation, and "absent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City." *Whitney*, 887 F.3d at 861 (citing *Malone*, 847 F.3d at 955; *Sitzes*, 606 F.3d at 470; *Sanders*, 474 F.3d at 527). "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Mettler*, 165 F.3d at 1204. "An unconstitutional governmental policy can be inferred from a single decision taken by the highest official responsible for setting policy in that area of the government's business." *Dean v. Cnty. of Gage*, 807 F.3d 931, 940–41 (8th Cir. 2015) (quoting *Angarita v. St. Louis Cnty.*, 981 F.2d 1537, 1546 (8th Cir. 1992)). As county sheriff, Sheriff Ford admittedly was responsible for setting the policies and priorities of the Dallas County Sherriff's Office (Dkt. No. 185-16, at 39–40). Therefore, Sheriff Ford was a policymaker for the Dallas County Sherrif's Office. *See Hayes v. Faulkner Cnty.*, 285 F. Supp. 2d 1132, 1139 (E.D. Ark. 2003), *aff'd*, 388 F.3d 669 (8th Cir. 2004) (noting that it was "undisputed" that the county sheriff was a policy maker for the county).

Having established that a reasonable jury could conclude that Sheriff Ford, the policymaker for Dallas County Sheriff's Office, destroyed the evidence in bad faith, there is a triable issue of material fact as to whether Dallas County is liable for Sheriff Ford's alleged actions. Therefore, the Court denies County Defendants' motion for summary judgement on Plaintiffs' destruction of evidence claims against Sheriff Ford and, in turn, will allow Plaintiffs' *Monell* liability claims against Dallas County for Sheriff Ford's alleged destruction of evidence to proceed (Dkt. No. 189).

### D.    State Police Defendants' Alleged Destruction of Evidence

Plaintiffs do not appear to make any specific allegations that State Police Defendants destroyed any evidence in violation of Plaintiffs' Fourteenth Amendment rights as required under 42 U.S.C. § 1983.  *See Iqbal*, 556 U.S. at 676.  Any general allegations Plaintiffs make regarding State Police Defendants in this regard are insufficient at this stage of the litigation.  Therefore, the Court grants State Police Defendants' motion for summary judgment as to Plaintiffs' claims that State Police Defendants destroyed evidence (Dkt. No. 192).

### V.    Suppression Of Evidence Claims

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

> There are three components of a true *Brady* violation:  The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.

*Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).  In other words, "[t]o establish a *Brady* violation, the defendant must show the government suppressed evidence that was both favorable to the defense and material to the issue of guilt or punishment."  *United States v. Williams*, 577 F.3d 878, 882 (8th Cir. 2009).  Separate plaintiff Jimerson alleges that "Defendant Investigators" "concealed all evidence of their fabrication by failing to document their activities and preparing false reports" in violation of Jimerson's Fourteenth Amendment right to due process (Dkt. No. 83, ¶ 88).[7]  The Court will analyze Plaintiffs' *Brady* claims against each defendant in turn.

---

[7]  Thompson makes the same allegation against "Investigator Defendants" with respect to alleged violations of Brown's Fourteenth Amendment rights (Case No. 4:20-cv-1155, Dkt. No. 42, ¶ 117).

As an initial matter, County Defendants claim that any *Brady* claim should be dismissed because the Eighth Circuit has already ruled that Jimerson's *Brady* claim was time-barred (Dkt. No. 191, at 7 (citing *Jimerson*, 957 F.3d at 925)).  In *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994), the Supreme Court held that:

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of *habeas corpus*, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.  Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

*Id.*

"Only once the criminal proceeding has ended in the defendant's favor, or a resulting conviction has been invalidated within the meaning of *Heck*, *see* 512 U.S. at 486–487, 114 S.Ct. 2364, will the statute of limitations begin to run."  *McDonough v. Smith*, 588 U.S. 109, 119–20 (2019).

On April 29, 2020, the Eighth Circuit affirmed the grant of *habeas* relief to Jimerson and Brown.  *Jimerson*, 957 F.3d at 931.  Approximately five months later, on September 25, 2020, separate plaintiff Jimerson filed her individual § 1983 action seeking relief for allegations that Defendants destroyed and suppressed evidence (*See generally* Dkt. No. 1).  Four days later, on September 29, 2020, separate plaintiff Thompson filed his individual § 1983 action on behalf of

Brown seeking similar relief (Case No. 4:20-cv-1155, Dkt. No. 1).[8]  "In Arkansas, the general personal-injury statute of limitations is three years, and this period therefore governs § 1983 actions brought in that state."  *Ketchum v. City of W. Memphis*, 974 F.2d 81, 82 (8th Cir. 1992). Here, the three-year statute of limitations for Plaintiffs to bring this § 1983 action began running on April 29, 2020, when the Eighth Circuit affirmed the grant of *habeas* relief.  Because Plaintiffs commenced this § 1983 action within three years after the affirmance of the *habeas* relief, this action, and all claims brought herein, are timely.[9]

### A.    Fordyce Defendants' Alleged Suppression Of Evidence

### 1.    Separate Defendant Chief Poole

Fordyce Defendants move for summary judgment on Plaintiff's *Brady* violation claims arguing that no material facts suggests that any Fordyce Defendant suppressed any evidence in bad faith (Dkt. No. 184, at 24–25).  Plaintiffs maintain that the Prescott Tape was exculpatory material and was suppressed in bad faith (Dkt. No. 210, at 29).

### a.    Claim:  Prescott Tape

Fordyce Defendants argue, relying on *Villasana*, 368 F.3d at 979, that they discharged any duty under *Brady* by disclosing the existence of the Prescott Tape to the prosecutors (Dkt. No. 84, at 25–27).  Further, Fordyce Defendants claim that Plaintiffs are precluded under the doctrine of issue preclusion from arguing that the prosecutors were unaware of the Prescott Tape based on the Eighth Circuit's finding in Plaintiffs' *habeas* proceedings (Dkt. No. 184, at 27).  The Court finds

---

[8]  On October 27, 2020, the Court consolidated Ms. Jimerson and Thompson's cases (Dkt. No. 91).

[9]  Plaintiffs make allegations that separate defendant Investigator Earley suppressed evidence in violation of Plaintiffs' constitutional rights (Dkt. No. 210, at 28–29).  Separate defendant Investigator Earley did not move for summary judgment, so the Court declines to address Plaintiffs' claims against Investigator Earley in this Order.

that issue preclusion does not apply to this issue based on the Eighth Circuit's ruling in *Jimerson v. Payne*, 957 F.3d 916 (8th Cir. 2020).  An issue of material fact is precluded, and a party is prevented from relitigating the issue, when:

> (1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit;
>
> (2) the issue sought to be precluded must be the same as the issue involved in the prior action;
>
> (3) the issue sought to be precluded must have been actually litigated in the prior action;
>
> (4) the issue sought to be precluded must have been determined by a valid and final judgment; and
>
> (5) the determination in the prior action must have been essential to the prior judgment.

*Genuine Parts Co*., 128 F.3d at 1273 (citing *Tyus*, 93 F.3d 449, *cert. denied*, 520 U.S. 1166 (1997), *abrogated on other grounds by Taylor*, 553 U.S. 880).

Though the first factor is met because Plaintiffs were parties in the first matter, *see generally Jimerson*, 957 F.3d 916, the remaining factors weigh against a finding of issue preclusion.  Regarding the second and third factors, the Eighth Circuit did not reach the merits of Jimerson's alleged *Brady* violation because it found that "Jimerson's *Brady* claim [wa]s time-barred."  *Id.* at 925.  Regarding the fifth factor, the Eighth Circuit's finding that the prosecutors knew of the Prescott Tape's existence was not essential to the judgment given the Court's finding that the *Brady* claims were time-barred and given the Court's failure to reach the merits.  For these reasons, the Court finds that whether the prosecutors knew of the existence of the Prescott Tape is not precluded.

The Court continues its *Brady* analysis of the Prescott Tape.  Regarding the first prong of the *Brady* analysis, Fordyce Defendants claim that, even if the Prescott Tape was suppressed, it

lacks materiality (Dkt. No. 184, at 29). Here too, Fordyce Defendants rely on the fact that Jimerson testified that she was played an audio recording of Vaughn confessing and implicating Jimerson (*Id.*, at 29–30). However, this argument is unconvincing because the record reflects that there are two recorded audio tapes of Vaughn. The first tape is the tape at issue here, the Prescott Tape (Dkt. No. 205, ¶¶ 154–56). The second tape bearing Vaughn's voice is Vaughn's taped confession (*Id.*, ¶¶ 180–81). As discussed previously, the two tapes were procured before Jimerson was arrested (*Id.*, ¶ 195). Which tape recording of Vaughn that Jimerson heard the day of her arrest is a fact question for the jury to determine. Further, as previously discussed whether the Prescott Tape contained material evidence is also a fact question for the jury.

Therefore, because the contents of the Prescott Tape are unknown, whether the Prescott Tape contains exculpatory or impeachment evidence is a disputed issue for the jury to determine based on the record evidence when construed in the light most favorable to Plaintiffs.

The next prong of the *Brady* analysis, whether the State suppressed the evidence in question, also gives rise to a disputed issue for the jury to determine based on the record evidence when that evidence is construed in the light most favorable to Plaintiffs. As discussed at length in the Court's analysis of whether Chief Poole destroyed evidence of the Prescott Tape, the record reflects that Chief Poole participated in getting Prescott to agree to record secretly a conversation with Vaughn about the Holmes murder, and Chief Poole did not document the existence of the Prescott Tape (Dkt. No. 185-10, at 309). Chief Poole testified that he was "surprised" that he did not document the existence of the Prescott Tape or its contents because, according to Chief Poole, he should have documented it (*Id.*, at 310–11). Therefore, on the record before it, with all reasonable inferences drawn in Plaintiffs' favor, a reasonable jury could conclude that Chief

Poole's failure to document the existence of the Prescott Tape indicates that Chief Poole suppressed the evidence.

Lastly, the Court finds that a reasonable jury could conclude that prejudice resulted from Chief Poole's suppression of the Prescott Tape. Plaintiffs were unable to review the Prescott Tape and decide for themselves whether its contents contained evidence relevant for impeachment or witness credibility purposes.

Therefore, on the record before it, drawing all reasonable inferences in Plaintiffs' favor, the Court finds that a reasonable jury could conclude that Chief Poole committed a *Brady* violation by suppressing evidence of the Prescott Tape. The Court denies Fordyce Defendants' motion for summary judgment with respect to Plaintiffs' suppression of evidence claims against Chief Poole.

### b.    Qualified Immunity:  Separate Defendant Chief Poole

Next, the Court turns to whether Chief Poole is afforded qualified immunity for his alleged suppression of evidence. The qualified immunity analysis requires courts to consider whether a constitutional right was violated and whether such a right was clearly established at the time of the alleged violation. *See Partlow*, 774 F.3d at 501; *Willis* 141 F.4th at 911  For the reasons stated above, the first prong of the qualified immunity analysis is met because a reasonable jury could conclude that Chief Poole suppressed the evidence. The second prong is also met because at the time that the Prescott Tape was procured in March 1991 (Dkt. Nos. 205, ¶¶ 154–55), it was clearly established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Because a reasonable jury could conclude that Chief Poole violated Plaintiffs' constitutional rights that were

clearly established at the time of the alleged violation, the Court finds that Chief Poole is not entitled to qualified immunity on Plaintiffs' suppression of evidence claim.

### 2.    Separate Defendant Investigator Case

Plaintiffs do not appear to make any specific allegations that Investigator Case suppressed any evidence in violation of Plaintiffs' Fourteenth Amendment rights as required under 42 U.S.C. § 1983.  *See Iqbal*, 556 U.S. at 676.  Therefore, the Court grants Fordyce Defendants' motion for summary judgment as to Plaintiffs' claims that Investigator Case suppressed evidence (Dkt. No. 184).

### 3.    City Of Fordyce Municipal Liability

Having concluded that, from the record evidence with all reasonable inferences drawn in favor of Plaintiffs, a reasonable jury could conclude that Chief Poole suppressed evidence in violation of the Fourteenth Amendment and that genuine issues of material fact are in dispute and remain for trial, the Court next turns to whether the City of Fordyce can be held liable for Chief Poole's actions.  For the same reasons discussed previously in this Order, because Chief Poole, who was chief of police when the alleged constitutional violations occurred, was not a final policymaker under Arkansas law, the City of Fordyce cannot be held liable for Chief Poole's actions given the lack of an official custom, a policy, or actions on behalf of a policymaker who caused said constitutional violations.  *See Williams*, 2013 WL 5970686, at *10, *aff'd in part, dismissed in part*, 772 F.3d 1307 (citing *Bono Police Dep't*, 2008 WL 4493065; Ark. Code Ann. § 14-52-203).  Therefore, the Court grants Fordyce Defendants' motion for summary judgment as to Plaintiffs' *Monell* liability claims against the City of Fordyce for Chief Poole's alleged suppression of evidence.

### B.    County Defendants' Alleged Suppression Of Evidence

### 1.    Separate Defendant Sheriff Ford

Plaintiffs claim that the immunity agreement that Sheriff Ford and Chief Poole entered into with Prescott was suppressed in bad faith (Dkt. No. 210, at 34).

### a.    Claim:  Prescott Agreement

First, the Prescott Agreement could have been used by Plaintiffs to impeach Vaughn.  As noted by the Eighth Circuit, "Vaughn's mental functioning has been called into question.  Without the informant evidence, defense counsel could do little to challenge the veracity of Vaughn's confession, or, at a minimum, raise questions of credibility inherent in a cooperating informant." (Dkt. No. 210, at 35 (citing *Jimerson*, 957 F3.d at 931)).  Further, "credibility as a witness [is] therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to [witness] credibility and the jury [is] entitled to know of it."  *See Giglio v. United States*, 405 U.S. 150, 154–55 (1972) (holding that the government's failure to disclose the deal it made with its key witness violated the defendant's due process).  A reasonable jury, taking all inferences in Plaintiffs' favor, could infer that Prescott's immunity agreement, which was followed by Prescott's taped conversation with Vaughn, which was then shortly followed by Vaughn's decision to change his plea, influenced Vaughn's plea.

Second, a reasonable jury could conclude that the Prescott Agreement was suppressed in bad faith.  As discussed previously, Sheriff Ford did not document that he made an agreement with Prescott, nor did Sheriff Ford disclose the existence of the Prescott Agreement to Plaintiffs, Plaintiffs' counsel, or the prosecution.  Therefore, construing all inferences in Plaintiffs' favor, the Court finds that a reasonable jury could conclude that Sheriff Ford suppressed the Prescott Agreement in bad faith in violation of *Brady*.

b.    **Qualified Immunity:  Separate Defendant Sheriff Ford**

Next the Court turns to whether Sheriff Ford is afforded qualified immunity for his alleged suppression of evidence.  The qualified immunity analysis requires courts to consider whether a constitutional right was violated and whether such a right was clearly established at the time of the alleged violation.  *See Partlow*, 774 F.3d at 501; *Willis* 141 F.4th at 911.  For the reasons stated above, the first prong of the qualified immunity analysis is met because a reasonable jury could conclude that Sheriff Ford suppressed evidence of the Prescott Agreement.  The second prong is also met because at the time that the Prescott Agreement was entered into in March 1991 (Dkt. Nos. 205, ¶¶ 154–55), it was clearly established that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  Because a reasonable jury could conclude that Sheriff Ford violated Plaintiffs' constitutional rights that were clearly established at the time of the alleged violation, the Court finds that Sheriff Ford is not entitled to qualified immunity on Plaintiffs' suppression of evidence claims.

2.    **Separate Defendant Setterman**

Plaintiffs do not appear to make any specific allegations that Setterman suppressed any evidence in violation of Plaintiffs' Fourteenth Amendment rights as required under 42 U.S.C. § 1983.  *See Iqbal*, 556 U.S. at 676.  Therefore, the Court grants County Defendants' motion for summary judgment as to Plaintiffs' claims that Setterman suppressed evidence (Dkt. No. 184).

3.    **Dallas County Municipal Liability**

Having concluded that, from the record evidence with all reasonable inferences drawn in favor of Plaintiffs, a reasonable jury could conclude that Sheriff Ford suppressed material evidence

79

in violation of the Fourteenth Amendment and that genuine issues of material fact are in dispute and remain for trial, the Court next turns to whether Dallas County can be held liable for Sheriff Ford's actions.  For Dallas County to be liable under § 1983, there must be a municipal policy giving rise to the constitutional violation.  *Whitney*, 887 F.3d at 861 (citing *Malone*, 847 F.3d at 955; *Sitzes*, 606 F.3d at 470; *Sanders*, 474 F.3d at 527).  A policy can be inferred from actions taken by the policymaking official.  *Mettler*, 165 F.3d at 1204; *Dean*, 807 F.3d at 940–41 (quoting *Angarita,* 981 F.2d at 1546).

Sheriff Ford admittedly was responsible for setting the policies and priorities of the Dallas County Sheriff's Office, making him a policymaker for Dallas County (Dkt. No. 185-16, at 39–40).  *See Hayes*, 285 F. Supp. 2d at 1139, *aff'd*, 388 F.3d 669 (noting that it was "undisputed" that the county sheriff was a policy maker for the county).

Having established that a reasonable jury could conclude that Sheriff Ford, the policymaker for Dallas County Sheriff's Office, suppressed evidence, there is a genuine issue of material fact in dispute and triable as to whether Dallas County is liable for Sheriff Ford's actions.  Therefore, the Court denies County Defendants' motion for summary judgement on Plaintiffs' suppression of evidence claims against Sheriff Ford, and in turn, Plaintiffs' *Monell* liability claims against Dallas County for Sheriff Ford's alleged suppression of evidence (Dkt. No. 189).

### 4.    State Police Defendants' Alleged Suppression Of Evidence

Plaintiffs do not appear to make any specific allegations that State Police Defendants suppressed any evidence in violation of Plaintiffs' Fourteenth Amendment rights as required under 42 U.S.C. § 1983.  *See Iqbal*, 556 U.S. at 676.  Any general allegations Plaintiffs make regarding State Police Defendants in this regard are insufficient at this stage of the litigation.  Therefore, the

Court grants State Police Defendants' motion for summary judgment as to Plaintiffs' claims that State Police Defendants suppressed evidence (Dkt. No. 192).

### VI.    Plaintiffs' Reckless Investigation Claims

The Eighth Circuit Court of Appeals recognized a substantive due process cause of action for reckless investigation by law enforcement in *Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001).   The Eighth Circuit identified the liberty interest at stake as the "interest in obtaining fair criminal proceedings." *Id.* at 956 n.8 (citing *Brady*, 373 U.S. at 87).   The test for whether officers' actions violate this protected liberty interest is whether those actions shock the conscience. *Id.* at 956 (citing *County of Sacramento v. Lewis,* 523 U.S. 833, 846 (1988)); *see also Moran v. Clarke,* 296 F.3d 638, 647 (8th Cir. 2002) (en banc) ("[S]ubstantive due process is concerned with violations of personal rights. . . so severe. . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.") (citation modified and omitted).   Conduct intended to injure in some way unjustifiable by any government interest will generally rise to the conscience-shocking level, but negligent conduct falls "beneath the threshold of constitutional due process." *Lewis*, 523 U.S. at 849.   Deliberate indifference or recklessness falls somewhere between negligent and intentional actions. *Id.* at 849, 851.   "Only the most severe violations of individual rights that result from the 'brutal and inhumane abuse of official power' rise to this level." *White v. Smith*, 696 F.3d 740, 757-58 (8th Cir. 2012) (quoting *C.N. Willmar Publ. Schs., Indep. Sch. Dist. No. 347*, 591 F.3d 624, 634 (8th Cir. 2010)).

The Eight Circuit explained:

The Supreme Court has taken a context specific approach to determining whether intermediate culpable states of mind, such as recklessness, support a section 1983

claim by shocking the conscience and, thus, violating due process. [*County of Sacramento v. Lewis*, 523 U.S. 833,] 854 [1998] (holding, in context of high speed chase, officials violate substantive due process only if they act with an intent to harm); *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244–45, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (finding deliberate indifference/recklessness to a pretrial detainee's serious medical needs violates due process); *see also Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988) (holding, in a non–1983 case, that failure to preserve evidentiary material that was not obviously exculpatory, only violates due process if done in bad faith); *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding, in a non–1983 case, that suppression by the prosecution of evidence favorable to the defendant material to either guilt or punishment violates due process regardless of good faith or bad faith by the prosecution).

*Wilson,* 260 F.3d at 946.

Here Plaintiffs allege that defendants violated their Fourteenth Amendment Due Process right by recklessly investigating Holmes' rape and murder (Dkt. No. 83, ¶¶ 86–92; Case No. 4:20-cv-1155, ¶¶ 115–21). The Court will analyze Plaintiffs' reckless investigation claims against each defendant in turn.

### A.    Fordyce Defendants' Alleged Reckless Investigation

#### 1.    Separate Defendant Chief Poole

With respect to the reckless investigation conducted by separate defendant Chief Poole, Plaintiffs allege that Chief Poole fabricated evidence with respect to the testimony of witness Lee Parsons and destroyed and suppressed the Prescott Tape (Dkt. No. 210, at 24, 29, 47). As discussed above, there are genuine issues of material fact as to whether Chief Poole fabricated, suppressed, and destroyed evidence in violation of Plaintiffs' Fourteenth Amendment Due Process rights. Such conduct has been held to shock the conscience and violate due process. *See Youngblood*, 488 U.S. at 57 (holding that failure to preserve exculpatory evidence violates due process); *Brady,* 373 U.S. at 87 (holding that suppression of favorable evidence violates due process). Therefore, the Court denies Fordyce Defendants' motion for summary judgment with respect to Plaintiffs'

reckless investigation claims against Chief Poole (Dkt. No. 184). Further, because these constitutional rights were clearly established at the time that Chief Poole allegedly violated them, Chief Poole is not entitled to qualified immunity on Plaintiffs' reckless investigation claims.

### 2. Separate Defendant Investigator Case

With respect to the reckless investigation conducted by separate defendant Investigator Case, Plaintiffs appear to allege that separate defendant Investigator Case conspired with separate Investigator Godwin and fabricated the report of the interview of Shannon Manning (Dkt. No. 210, at 52). As discussed above, because no reasonable jury could conclude on the record evidence even with all reasonable inferences drawn in favor of Plaintiffs that the alleged fabricated information, the Manning Report, was used by the prosecution to secure a conviction of Plaintiffs, Investigator Case's alleged fabrication of evidence does not violate the Fourteenth Amendment. In turn, it does not shock the conscience. The Court grants Fordyce Defendants' motion for summary judgment as to Plaintiffs' reckless investigation claims against Investigator Case (Dkt. No. 184).

### 3. City of Fordyce Municipal Liability

For the same reasons as discussed above, because Chief Poole, who was chief of police when the alleged constitutional violations occurred, was not a final policymaker under Arkansas law, the City of Fordyce cannot be held liable for Chief Poole's actions given the lack of an official custom, a policy, or actions on behalf of a policymaker who caused said constitutional violations. *See Williams*, 2013 WL 5970686, at *10, *aff'd in part, dismissed in part*, 772 F.3d 1307 (citing *Bono Police Dep't*, 2008 WL 4493065; Ark. Code Ann. § 14-52-203). Therefore, the Court grants Fordyce Defendants' motion for summary judgment as to Plaintiffs' *Monell* liability claims against the City of Fordyce for Chief Poole's alleged reckless investigation (Dkt. No. 184).

## B.    County Defendants' Alleged Reckless Investigation

### 1.    Separate Defendant Sheriff Ford

With respect to the reckless investigation conducted by separate defendant Sheriff Ford, Plaintiffs allege that Sheriff Ford destroyed the Prescott Tape and suppressed the Prescott Agreement (Dkt. No. 210, at 19, 34).  As discussed above, there are genuine issues of material fact as to whether Sheriff Ford destroyed and suppressed evidence in violation of Plaintiffs' Fourteenth Amendment Due Process rights.  Further, such conduct has been held to shock the conscience and violate due process.  *See Youngblood*, 488 U.S. at 57; *Brady,* 373 U.S. at 87.  Therefore, the Court denies County Defendants' motion for summary judgment with respect to Plaintiffs' reckless investigation claims against Sheriff Ford.  Further, because these constitutional rights were clearly established at the time that Sheriff Ford allegedly violated them, Sheriff Ford is not entitled to qualified immunity on Plaintiffs' reckless investigation claims.

### 2.    Separate Defendant William Setterman

With respect to the reckless investigation conducted by separate defendant William Setterman, Plaintiffs allege that Setterman "furthered the false charges against Plaintiff Jimerson by casting suspicion on her when she reported that she had been raped." (Dkt. No. 210, at 53).  The Court finds that such alleged conduct even if true with all reasonable inferences from the alleged conduct construed in favor of Plaintiffs does not shock the conscience and, thus, does not violate the Fourteenth Amendment.  Moreover, however problematic the alleged conduct is, it is not the type of conduct contemplated by the clearly established law regarding reckless investigations.  For these reasons, the Court grants County Defendants' motion for summary judgment with respect to Plaintiffs' reckless investigation claims against Setterman (Dkt. No. 189).

### 3.    Dallas County Municipal Liability

Sheriff Ford admittedly was responsible for setting the policies and priorities of the Dallas County Sheriff's Office, making him a policymaker for Dallas County (Dkt. No. 185-16, at 39–40). *See Hayes*, 285 F. Supp. 2d at 1139, *aff'd*, 388 F.3d 669 (noting that it was "undisputed" that the county sheriff was a policymaker for the county).

Having established that a reasonable juror could conclude that Sheriff Ford's alleged reckless investigation of the Holmes murder shocked the conscience, and that Sheriff Ford was the policymaker for the Dallas County Sheriff's Office, there is a triable issue of material fact as to whether Dallas County is liable for Sheriff Ford's actions.  Therefore, the Court denies County Defendants' motion for summary judgement on Plaintiffs' reckless investigation claims against Sheriff Ford and, in turn, Plaintiffs' *Monell* liability claims against Dallas County for Sheriff Ford's alleged reckless investigation (Dkt. No. 189).

### C.    State Police Defendants' Alleged Reckless Investigation

### 1.    Separate Defendant Investigator Godwin

With respect to the reckless investigation conducted by separate defendant Investigator Godwin, Plaintiffs allege that Investigator Godwin fabricated evidence related to the interview of Manning as documented in the Manning Report (Dkt. No. 210, at 50, 53).  As discussed above, because no reasonable jury could conclude that the alleged fabricated information, the Manning Report, was used by the prosecution to secure a conviction of Plaintiffs, Investigator Godwin's alleged fabrication of evidence does not violate the Fourteenth Amendment.  Therefore, the Court grants State Police Defendants' motion for summary judgment as to Plaintiffs' reckless investigation claims against Investigator Godwin (Dkt. No. 192).

### 2.    Separate Defendant Lieutenant Bradshaw

With respect to the reckless investigation conducted by separate defendant Lieutenant Bradshaw, the Court does not find that any of Plaintiffs' allegations against Lieutenant Bradshaw violate the Fourteenth Amendment's Due Process Clause. Therefore, the Court grants State Police Defendants' motion for summary judgment as to Plaintiffs' reckless investigation claims against Lieutenant Bradshaw (*Id.*).

## VII.    Fourth Amendment Claims

The Fourth Amendment protects "'[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures.'" *Manuel v. City of Joliet*, 580 U.S. 357, 364 (2017) (quoting U.S. Const. amend. IV).

> The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause. [internal citation omitted]. That can happen when the police hold someone without any reason before the formal onset of a criminal proceeding. But it also can occur when legal process itself goes wrong—when, for example, a judge's probable-cause determination is predicated solely on a police officer's false statements. Then, too, a person is confined without constitutionally adequate justification.

*Id.* at 367.

"Government actors may violate the Fourth Amendment by including false information in, or omitting truthful information from, a probable cause affidavit, and such action constitutes a *Franks* violation." *Est. of Nash v. Folsom*, 92 F.4th 746, 754 (8th Cir. 2024). "Omitting information violates *Franks* when '1) . . . facts were omitted with the intent to make, or in reckless disregard of whether they thereby make, the affidavit misleading, and 2) . . . the affidavit, if supplemented by the omitted information, could not support a finding of probable cause.'" *Id.* (quoting *Williams*, 772 F.3d at 1312).

> Recklessness . . . may be inferred from the fact of omission of information from an affidavit when the material omitted would have been *clearly critical* to the finding

of probable cause.  Whether the omitted information is "clearly critical" requires reconstructing the probable cause affidavit with the omissions and determining whether an issuing court would find the omitted information "clearly critical" to the probable cause analysis.

*Id.* (emphasis in original) (internal citations and quotations omitted).

"Probable cause exists if the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed an offense." *Howe v. Gilpin*, 65 F.4th 975, 980 (8th Cir. 2023), *cert. denied*, 144 S. Ct. 495, (2023) (quoting *Williams*, 772 F.3d at 1310).

Separate Plaintiff Jimerson alleges that "Defendant Investigators arrested plaintiff without probable cause for the murder and rape of Myrtle Holmes and caused her to be detained prior to the initiation of legal process . . . in violation of her Fourth Amendment rights." (Dkt. No. 83, ¶ 95).  Similarly, separate plaintiff Thompson alleges that "Investigator Defendants, accused [Mr.] Brown of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against him without any probable cause . . . ." (Case No. 4:20-cv-1155, Dkt. No. 42, ¶ 124).  The Court addresses the alleged Fourth Amendment claim with respect to each separate plaintiff in turn.

### A.    Alleged Violation Of Brown's Fourth Amendment Rights

As an initial matter, defendants investigated the Holmes murder and then turned over the investigative file to the prosecutors, Tom Wynne and Robin Wynne, who then determined that there was probable cause to charge and arrest Plaintiffs (*See* Dkt. No. 185-4, at 68–69).  Therefore, the Court reviews the ASP investigative file to determine what evidence the prosecutors were given and likely used in making their probable cause determination (*See* Dkt. No. 185-1).

Fordyce Defendants maintain that there was probable cause to arrest Brown (Dkt. No. 184, at 31).  Specifically, Fordyce Defendants claim:

probable cause to arrest [Mr.] Brown was formed from witness accounts and DNA evidence that identified a co-defendant, [Mr.] Early, who witnesses had connected to [Mr.] Brown. At the time of his arrest, multiple witnesses had implicated [Mr.] Brown in the crime. The fact that DNA confirmed that [Mr.] Early, another suspect also implicated by witnesses, was at the scene of the crime made these witness accounts more credible.

(*Id.* (internal citations omitted)).

In response, Plaintiffs claim that there was not probable cause to arrest Brown because fabricated evidence cannot be used to establish probable cause (Dkt. No. 210, at 50). According to Plaintiffs, the statement from Manning was fabricated (*Id.*). As discussed in this Order, there are genuine issues of material fact as to whether the Manning Report was fabricated.

Plaintiffs further claim that a reasonable jury could credit Investigator Earley's "admission that Taura Bryant was drug addicted, mentally ill, and, for those and other reasons, not worthy of belief." (*Id.*). However, witness credibility, is a question for the jury. *See Giglio*, 405 U.S. at 154–55.

Setting aside the aforementioned evidence for which Plaintiffs dispute the veracity, the Court considers Jenkins' statement about Brown (*See* Dkt. No. 185-1, at 112–26). On June 20, 1989, Investigator Godwin interviewed Jenkins (*Id.*, at 112). Plaintiffs do not assert that Jenkins' interview was fabricated, but rather, Plaintiffs question the credibility of Jenkins as a witness (Dkt. No. 210, at 50–51). However, again, witness credibility determinations are for the jury. *See Giglio*, 405 U.S. at 154–55. Plaintiffs further assert that the information Jenkins provided regarding Brown was hearsay (*Id.*). However, the Eighth Circuit has held that "[h]earsay evidence, however, is a permissible basis for a finding of probable cause under Fed. R. Crim. P. 41(c)(1)." *United States v. Henry*, 763 F.2d 329, 331 (8th Cir. 1985).

The Court reconstructs the probable cause determination by omitting the alleged fabricated evidence and including the evidence alleged to have been intentionally omitted to determine if

there was still probable cause to arrest and detain Brown for Holmes' murder. *See Folsom*, 92 F.4th at 754. Specifically, Plaintiffs do not allege that Jenkins' interview with Investigator Godwin was fabricated. Jenkins told Investigator Godwin that Early told Jenkins that he robbed and killed Holmes (Dkt. No. 185-1, at 112–15). Jenkins went on to tell Investigator Godwin that Charles Cross told Jenkins that Brown said that he helped Early kill Holmes (*Id.*, at 116).

With respect to the first *Franks* prong—whether the law enforcement officers acted recklessly—as discussed above, there are genuine issues of material fact as to whether defendants acted recklessly by intentionally fabricating evidence pertaining to Brown—namely the Manning Report. Notwithstanding this, Plaintiffs fail to satisfy the second *Franks* prong because, even when ignoring the tainted evidence and considering the omitted evidence, the Court finds that there was probable cause to arrest and detain Brown for Holmes' murder. The ASP had DNA evidence linking Early to Holmes' murder (Dkt. No. 184, at 31). The record also reflects that Brown was a known associate of Early (*Id.*). Lastly, Jenkins testified that Brown said that he assisted Early in killing Holmes (Dkt. No. 185-1, at 116). Considering this untainted evidence, the Court finds that there was probable cause to arrest and detain Brown for Holmes' murder. Therefore, the Court grants Fordyce Defendants, County Defendants, and State Police Defendants' motions for summary judgment with respect to Brown's Fourth Amendment claims (Dkt. Nos. 184; 189; 192).

### 2. Alleged Violation Of Jimerson's Fourth Amendment Rights

Fordyce Defendants claim that there was probable cause to arrest Jimerson because she was identified in Vaughn's confession and plea (Dkt. No. 184, at 31). In response, Plaintiffs concede that, "[o]n its face, [Mr.] Vaughn's admissions at the plea hearing would appear to support a finding of probable cause." (Dkt. No. 210, at 51). However, Plaintiffs argue that the prosecutors who charged Jimerson based on the admissions from Vaughn's plea "were unaware of the Prescott

Tape, the Prescott Agreement, and the fact that Vaughn's plea followed a lengthy conversation that Prescott initiated with Vaughn in the Jail with the aim of getting a confession from Vaughn so that Prescott could secure his freedom." (*Id.*).

The Court finds that there was probable cause to arrest and detain Jimerson for Holmes' murder. Vaughn testified in open court and implicated Jimerson in the murder (Dkt. No. 185-3, at 4–16). Further, Judge Graves found that Vaughn testified knowingly and intelligently (*Id.*, at 16–17).

The ASP investigative file, that was provided to the prosecutors, also includes a statement that Investigator Godwin received from Setterman who at the time was employed by the Calhoun County Sheriff's Department (Dkt. No. 185-1, at 108). Setterman interviewed Jimerson regarding her being a possible rape victim (*Id.*). According to Setterman, Jimerson "made reference about the Myrtle Holmes [r]ape/[m]urder. Jimerson immediately became very nervous, and stated to writer that some people were saying that she had taken John Brown to Myrtle Holmes['] residence." (*Id.*). Setterman further stated that Jimerson became increasingly nervous about the Holmes subject before changing the subject (*Id.*).

This evidence, coupled with Vaughn's admissions during his plea hearing in open court, warrants a finding that there was probable cause to arrest and detain Jimerson for Holmes' murder. Therefore, the Court grants Fordyce Defendants, County Defendants, and State Police Defendants' motions for summary judgment with respect to Jimerson's alleged Fourth Amendment violations (Dkt. Nos. 184; 189; 192).

### VIII.   Section 1983 Conspiracy Claims

"To prove a § 1983 conspiracy claim, [the plaintiff] must prove: (1) that the defendants conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-

conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured him." *Holmes v. Slay*, 895 F.3d 993, 1001 (8th Cir. 2018) (alteration in original) (quoting *Bonenberger v. St. Louis. Metro. Police Dep't*, 810 F.3d 1103, 1109 (8th Cir. 2016)).  "[T]he plaintiff must allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement.  [The plaintiff] can satisfy this burden by 'pointing to at least some facts which would suggest [the defendants] "reached an understanding" to violate [his] rights.'"  *Bonenberger*, 810 F.3d at 1109 (alterations in original) (quoting *City of Omaha Emps. Betterment Ass'n v. City of Omaha*, 883 F.2d 650, 652 (8th Cir.1989)).

Here, separate plaintiff Jimerson alleges that "Defendant Investigators, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to intentionally deprive [Jimerson] of her constitutional rights . . . ." (Dkt. No. 83, ¶ 100).[10]  Plaintiffs maintain that the following separate defendants, all employed by three different agencies—the City of Fordyce, Dallas County, Arkansas, and the Arkansas State Police— conspired to violate Plaintiffs' constitutional rights:  Chief Poole, Investigator Case, Sheriff Ford, Setterman, Investigator Godwin, Lieutenant Bradshaw, and Investigator Earley (Dkt. No. 210, at 58).[11]  The Court addresses Plaintiffs' conspiracy claims with respect to each group of defendants in turn.  First, the Court assesses whether there are alleged overt acts as to each defendant Plaintiffs seek to hold accountable under the conspiracy.  Next, the Court examines the law as applied to the record evidence before the Court.

---

[10]    Thompson makes the same allegation against "Investigator Defendants." (Case No. 4:20-cv-1155, Dkt. No. 42, ¶¶ 133–37).

[11]    Separate defendant Investigator Earley did not move for summary judgment, so the Court declines to address Plaintiffs' claims against Investigator Earley in this Order.

### A.      Fordyce Defendants' Alleged Conspiracy

#### 1.      Separate Defendant Chief Poole

With respect to the alleged overt acts indicative of a conspiracy committed by separate defendant Chief Poole, Plaintiffs allege that Chief Poole fabricated evidence with respect to the testimony of witness Lee Parsons and destroyed and suppressed the Prescott Tape (Dkt. No. 210, at 24, 29, 47).

#### 2.      Separate Defendant Investigator Case

With respect to the alleged overt acts indicative of a conspiracy committed by separate defendant Investigator Case, Plaintiffs appear to allege that separate defendant Investigator Case conspired with separate Investigator Godwin and fabricated the report of the interview of Manning as documented in the Manning Report (Dkt. No. 210, at 52).

### B.      County Defendants' Alleged Conspiracy

#### 1.      Separate Defendant Sheriff Ford

With respect to the alleged overt acts indicative of a conspiracy committed by separate defendant Sheriff Ford, Plaintiffs allege that Sheriff Ford destroyed the Prescott Tape and suppressed the Prescott Agreement (Dkt. No. 210, at 19, 34).

#### 2.      Separate Defendant William Setterman

With respect to the alleged overt acts indicative of a conspiracy committed by separate defendant Setterman, Plaintiffs allege that Setterman "furthered the false charges against Plaintiff Jimerson by casting suspicion on her when she reported that she had been raped." (Dkt. No. 210, at 53).

### C.    State Police Defendants' Alleged Conspiracy

#### 1.    Separate Defendant Investigator Godwin

With respect to the alleged overt acts indicative of a conspiracy committed by separate defendant Investigator Godwin, Plaintiffs allege that Investigator Godwin fabricated evidence related to the interview of Manning as documented in the Manning Report (Dkt. No. 210, at 50, 53).

#### 2.    Separate Defendant Lieutenant Bradshaw

With respect to the alleged overt acts indicative of a conspiracy committed by separate defendant Lieutenant Bradshaw, Plaintiffs allege that Lieutenant Bradshaw concealed information related to the witness Bryant and the existence of the Prescott Tape (Dkt. No. 210, at 53).

### Section 1983 Conspiracy Claims Analysis

Having identified overt acts committed by each separate defendant, the Court next considers whether, based on the record before it, the Court can infer that defendants reached an agreement to violate Plaintiffs' rights.

> The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a "meeting of the minds" or understanding among the conspirators to achieve the conspiracy's aims." [*Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996).] Because "the elements of a conspiracy are rarely established through means other than circumstantial evidence, and summary judgment is only warranted when the evidence is so one-sided as to leave no room for any reasonable difference of opinion as to how the case should be decided. The court must be convinced that the evidence presented is insufficient to support any reasonable inference of a conspiracy."

*White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008) (quoting *Westborough Mall, Inc. v. City of Cape Girardeau*, 693 F.2d 733, 743 (8th Cir. 1982)).

Here, the Court finds that the evidence is not "so one-sided as to leave no room for any reasonable difference of opinion" on the issue of whether defendants entered into an agreement to violate Plaintiffs' rights.  The record reflects, and the Court has discussed in this Order, that there are triable issues of material fact as to whether defendants from three different law enforcement agencies either fabricated, destroyed, or suppressed material evidence in the investigation of the Holmes murder.  Further, the record reflects that separate defendants were often working in tandem across the different law enforcement agencies when the alleged investigatory conduct at issue occurred.  Therefore, construing all inferences in Plaintiffs' favor, there are triable issues of material fact as to whether defendants conspired to violate Plaintiffs' rights.  The Court denies Fordyce Defendants, County Defendants, and State Police Defendants' respective motions for summary judgment as to Plaintiffs' claims that defendants conspired to violate Plaintiffs' rights (Dkt. Nos. 184; 189; 192).

### IX.    State Law Malicious Prosecution Claims

Plaintiffs also bring a malicious prosecution claim against defendants under Arkansas law (Dkt. No. 83, ¶¶ 105–09; Case No. 4:20-cv-1155, Dkt. No. 42, ¶¶ 138–42).  To prove malicious prosecution under Arkansas law, a plaintiff must prove:  "(1) a proceeding instituted or continued by the defendant against the plaintiff; (2) termination of the proceeding in favor of the plaintiff; (3) absence of probable cause for the proceeding; (4) malice on the part of the defendant; and (5) damages."  *William*s, 2013 WL 5970686, at *10 (quoting *Brooks v. First State Bank, N.A.*, 374 S.W.3d 846, 849 (Ark. 2010)).  Here, as discussed above, the record reflects that there was probable cause, even when not considering the allegedly tainted evidence and considering evidence intentionally omitted, to arrest and detain Plaintiffs.  Therefore, the Court grants Fordyce

Defendants, County Defendants, and State Police Defendants' motions for summary judgment with respect to Plaintiffs' alleged state law malicious prosecution claims (Dkt. Nos. 184; 189; 192).

## X.     State Law Civil Conspiracy Claims

To prove a civil conspiracy under Arkansas law, "a plaintiff must show that two or more persons have combined to accomplish a purpose that is unlawful or oppressive or to accomplish some purpose, not in itself unlawful, oppressive or immoral, but by unlawful, oppressive or immoral means, to the injury of another." *Faulkner v. Arkansas Children's Hosp.*, 69 S.W.3d 393, 406 (Ark. 2002) (citing *Chambers v. Stern*, 64 S.W.3d 737 (Ark. 2002); *Dodson v. Allstate Ins. Co.*, 47 S.W.3d 866 (Ark. 2001); *Mason v. Funderburk*, 446 S.W.2d 543 (Ark. 1969)). "A civil conspiracy is an intentional tort which requires a specific intent to accomplish the contemplated wrong." *Faulkner*, 69 S.W.3d at 406. A civil conspiracy "may be inferred from actions of alleged conspirators, if it be shown that they pursued the same unlawful object, each doing a part, so that their acts, although apparently independent, are in fact connected and cooperative, indicating a closeness of personal association and a concurrence of sentiment." *Mason*, 446 S.W.2d at 548.

For similar reasons as discussed in the Court's analysis of Plaintiffs' § 1983 conspiracy claims, the Court finds that there are triable issues of material fact on Plaintiffs' state law conspiracy claims. Therefore, construing all inferences in Plaintiffs' favor, the Court determines that there are genuine issues of material fact in dispute as to whether defendants conspired to violate Plaintiffs' rights. The Court denies Fordyce Defendants, County Defendants, and State Police Defendants' respective motions for summary judgment as to Plaintiffs' state law conspiracy claims (Dkt. Nos. 184; 189; 192).

### XI.    Separate Plaintiff Thompson's Failure to Intervene Claims

The Eighth Circuit recognizes a failure to intervene claim only in the context of excessive force violations.  *Livers*, 700 F.3d at 360 ("We have not recognized a duty to intervene to prevent other constitutional violations.").  Separate plaintiff Thompson brings a failure to intervene claim against "Investigator Defendants." (Case No. 4:20-cv-1155, Dkt. No. 42, ¶¶ 129–32).  Fordyce Defendants and State Police Defendants move to dismiss Thompson's failure to intervene claims on the grounds that such a claim is not recognized by the Eighth Circuit (Dkt. Nos. 184, at 39–40; 192, at 8–9).  Plaintiffs acknowledge that the "failure to intervene claims cannot succeed in this Circuit at this time." (Dkt. No. 210, at 60).  Because the Eighth Circuit does not recognize a failure to intervene claim for the claims that separate plaintiff Thompson brings, the Court grants Fordyce Defendants' and State Police Defendants' motions for summary judgment with respect to Thompson's failure to intervene claims (Dkt. Nos. 184; 192).

Further, the Court, on its own accord, dismisses Thompson's failure to intervene claims against County Defendants given that such a claim cannot succeed in this Circuit at this time.

### XII.    Separate Plaintiff Thompson's Intentional Infliction Of Emotional Distress Claims

#### A.    Analysis Of Claim

In an action for intentional infliction of emotional distress, a plaintiff must sufficiently allege four elements:  (1) the defendant intended to inflict emotional distress or knew or should have known that emotional distress was a likely result of his conduct; (2) the defendant's conduct was "extreme and outrageous," was "beyond all possible bounds of decency," and was "utterly intolerable in a civilized community"; (3) the actions of the defendant caused the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.  *Williams v. Mannis*, 889 F.3d 926, 932 (8th Cir. 2018)

(quoting *Crockett v. Essex*, 19 S.W.3d 585, 589 (Ark. 2000)).  Generally, Arkansas courts look to several factors to determine whether conduct is "extreme and outrageous."  *Doe v. Wright*, 82 F.3d 265, 269 (8th Cir. 1996).  Those factors include:  the conduct at issue; the amount of time over which the conduct took place; the relation between the plaintiff and defendant; and the defendant's knowledge that the plaintiff is particularly susceptible to emotional distress by some mental or physical peculiarity.  *Id.*

The Arkansas Supreme Court has repeatedly held that "the tort of [intentional infliction of emotional distress] is not favored by this court and that clear cut proof is required to establish the elements in outrage cases."  *Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 762 (8th Cir. 1998) (quoting *Shepherd v. Wash. Cnty.*, 962 S.W.2d 779, 792 (Ark. 1998)).  As such, Arkansas courts have taken a strict approach to determining the validity of an intentional infliction of emotional distress claim, recognizing that the "tort of [intentional infliction of emotional distress] should not and does not open the doors of the courts to every slight insult or indignity one must endure in life."  *Tandy Corp. v. Bone*, 678 S.W.2d 312, 315 (Ark. 1984).  The type of conduct that meets the standard for outrage is determined case by case.  *Crockett*, 19 S.W.3d at 589.  Merely describing conduct as outrageous does not make it so.  *Id.*  Even gross negligence cannot be characterized as "atrocious or exceeding all possible bounds of decency."  *Wood v. National Computer Systems, Inc.*, 814 F.2d 544, 545 (8th Cir. 1987).

Fordyce Defendants and County Defendants rely on the Court's decision in *Ratliff v. City of Shannon Hills*, 52 F. Supp. 3d 904 (E.D. Ark. 2014), to support their arguments that Thompson's intentional infliction of emotional distress claims fail because there was probable cause to arrest and detain him.  However, this case is distinguishable from *Ratliff*.  In *Ratliff*, the plaintiff brought claims for violations of the Fourth Amendment and the Fourteenth Amendment's Equal Protection

Clause because she was allegedly arrested based on her race. *Id.* at 908. There, the Court found that that "a reasonable juror could not find that an arrest based on probable cause, even considering the other facts Ms. Ratliff alleges regarding Chief Hale and Officer Lucky's conduct, 'extreme and outrageous.'" *Id.* at 915 (citing *Miles v. City of Hartford*, 719 F.Supp.2d 207, 218 (D.Conn. 2010), *aff'd*, 445 F. App'x. 379 (2d Cir. 2011); *Hullender v. City of Kings Mountain*, Case No. 1:01–cv–41–c, 2002 WL 1919560, at *6 (W.D.N.C. Aug. 16, 2002)).

The Court acknowledges that it concludes that when considering the untainted evidence and the evidence intentionally omitted, it finds that there was probable cause to arrest Thompson. Notwithstanding this, the record reflects that there are genuine issues of material fact in dispute as to whether defendants fabricated, destroyed, and suppressed evidence leading to Brown being convicted of the rape and murder of Holmes. The Court finds that a reasonable jury could conclude that defendants' alleged actions that contributed to Brown being convicted and spending decades incarcerated for the death and rape of Holmes before being granted *habeas* relief were outrageous and caused Brown stress that no reasonable person could be expected to endure. Therefore, the Court denies Fordyce Defendants and County Defendants' motions for summary judgment with respect to Brown's intentional infliction of emotional distress claims (Dkt. Nos. 184; 189).

### B.    County Defendants' State Law Immunity For Intentional Torts

Under Arkansas law:

(a) It is declared to be the public policy of the State of Arkansas that all counties, municipal corporations, school districts, public charter schools, special improvement districts, law enforcement agencies for and certified law enforcement officers employed by a public or private institution of higher education, and all other political subdivisions of the state and any of their boards, commissions, agencies, authorities, or other governing bodies shall be immune from liability and from suit for damages except to the extent that they may be covered by liability insurance.

(b) No tort action shall lie against any such political subdivision because of the acts
of its agents and employees

Ark. Code Ann. § 21-9-301.

The Arkansas Supreme Court has held that Arkansas Code Annotated § 21-9-301 does not

apply to intentional acts. In *Battle v. Harris*, 766 S.W.2d 431, 433 (Ark. 1989), the Arkansas

Supreme Court held:

> although we have held that the public officials named under § 21–9–301 are
> immune from tort liability, *viz.,* negligent acts committed in the performance of
> their official duties, *Autry v. Lawrence,* 286 Ark. 501, 696 S.W.2d 315 (1985), we
> have never interpreted that immunity to include intentional torts committed by
> those officials. We reject any suggestion to do so now.

*Id.*

Here, County Defendants, relying on Arkansas Code Annotated § 21-9-301, claim that they

are entitled to statutory immunity under Arkansas law for Thompson's state law tort claim for

intentional infliction of emotional distress (Dkt. Nos. 191, at 19).

The Arkansas Supreme Court reaffirmed that the immunity provided by Arkansas Code

Annotated § 21-9-301 does not apply to intentional torts in *Deitsch v. Tillery*, 833 S.W.2d 760,

762 (Ark. 1992). There, the Arkansas Supreme Court held that, "the tort of outrage, also known

as the intentional infliction of emotional distress . . . is an intentional tort. Appellants are correct

that Section 21–9–301 does not provide immunity for the intentional acts of [counties] and their

employees, only their negligent acts." *Id.* (citing *Waire v. Joseph*, 825 S.W.2d 594 (Ark. 1992)).

The Arkansas Supreme Court's precedent makes clear that Arkansas Code Annotated § 21-

9-301 does not apply to intentional torts. Therefore, County Defendants' argument that they are

entitled to statutory immunity on this basis for Thompson's claim for intentional infliction of

emotional distress fails. The Court finds that County Defendants are not entitled to Arkansas

statutory immunity on Thompson's intentional infliction of emotional distress claim (Dkt. No. 189).

### C.    State Police Defendants' State Law Immunity For Intentional Torts

Under Arkansas law:

> Officers and employees of the State of Arkansas are immune from liability and from suit, except to the extent that they may be covered by liability insurance, for damages for acts or omissions, other than malicious acts or omissions, occurring within the course and scope of their employment.

Ark. Code Ann. § 19-10-305(a) (recodified Ark. Code Ann. § 25–44–305).

"[F]or a plaintiff to counter an assertion of sovereign immunity, he or she must allege sufficient facts in his or her complaint to support the claim of malicious conduct by the defendant." *Fuqua v. Flowers*, 20 S.W.3d 388, 391 (Ark. 2000) (citing *Newton v. Etoch*, 965 S.W.2d 96 (Ark. 1998)).  Malice is "an intent and disposition to do a wrongful act greatly injurious to another."  *Id.* (citing *Satterfield v. Rebsamen Ford, Inc*., 485 S.W.2d 192 (Ark. 1972)).

State Police Defendants claim that they are entitled to immunity, pursuant to Arkansas Code Annotated § 19-10-305(a), for Thompson's state law tort claims (Dkt. No. 194, at 7–8). Here, the Court finds that a reasonable jury could find that State Police Defendants acted with malice because there are genuine issues of material fact as to whether evidence was intentionally fabricated, suppressed, and destroyed.  Because a reasonable jury could conclude that State Police Defendants acted with malice, the Court finds that State Police Defendants are not entitled to

statutory immunity for Thompson's intentional infliction of emotional distress claim (Dkt. No. 192).

### XIII.    Conclusion

For these reasons, the Court grants, in part, and denies, in part, Fordyce Defendants, County Defendants, and State Police Defendants' motions for summary judgment (Dkt. Nos. 184; 189; 192).  It is therefore ordered that:

1.    The Court dismisses Plaintiffs' claims against Investigator Kellam and Sergeant McAnally;

2.    The Court denies Fordyce Defendants' motion for summary judgment with respect to Plaintiffs' fabrication of evidence claims against Chief Poole, finds that Chief Poole is not entitled to qualified immunity on the fabrication of evidence claims, and grants Fordyce Defendants' motion for summary judgment with respect to Plaintiffs' fabrication of evidence claims against Investigator Case and the City of Fordyce (Dkt. No. 184);

3.    The Court grants County Defendants' motion for summary judgment with respect to Plaintiffs' fabrication of evidence claims (Dkt. No. 189);

4.    The Court grants State Police Defendants' motion for summary judgment with respect to Plaintiffs' fabrication of evidence claims (Dkt. No. 192);

5.    The Court denies Fordyce Defendants' motion for summary judgment with respect to Plaintiffs' destruction of evidence claims against Chief Poole, finds that Chief Poole is not entitled to qualified immunity on Plaintiffs' destruction of evidence claims, and grants Fordyce Defendants' motion for summary judgment with respect

to Plaintiffs' destruction of evidence claims against Investigator Case and the City of Fordyce (Dkt. No. 184);

6.    The Court denies County Defendants' motion for summary judgment with respect to Plaintiffs' destruction of evidence claims against Sheriff Ford and Dallas County, finds that Sheriff Ford is not entitled to qualified immunity on Plaintiffs' destruction of evidence claims, and grants County Defendants' motion for summary judgment with respect to Plaintiffs' destruction of evidence claims against Setterman (Dkt. No. 189);

7.    The Court grants State Police Defendants' motion for summary judgment with respect to Plaintiffs' destruction of evidence claims (Dkt. No. 192);

8.    The Court denies Fordyce Defendants' motion for summary judgment with respect to Plaintiffs' suppression of evidence claims against Chief Poole, finds that Chief Poole is not entitled to qualified immunity on the suppression of evidence claims, and grants Fordyce Defendants' motion for summary judgment with respect to Plaintiffs' suppression of evidence claims against Investigator Case and the City of Fordyce (Dkt. No. 184);

9.    The Court denies County Defendants' motion for summary judgment with respect to Plaintiffs' suppression of evidence claims against Sheriff Ford and Dallas County, finds that Sheriff Ford is not entitled to qualified immunity on Plaintiffs' suppression of evidence claims, and grants County Defendants' motion for summary judgment with respect to Plaintiffs' suppression of evidence claims against Setterman (Dkt. No. 189);

10.     The Court grants State Police Defendants' motion for summary judgment with respect to Plaintiffs' suppression of evidence claims (Dkt. No. 192);

11.     The Court denies Fordyce Defendants' motion for summary judgment with respect to Plaintiffs' reckless investigation claims against Chief Poole, finds that Chief Poole is not entitled to qualified immunity on the reckless investigation claims, and grants Fordyce Defendants' motion for summary judgment with respect to Plaintiffs' reckless investigation claims against Investigator Case and the City of Fordyce (Dkt. No. 184);

12.     The Court denies County Defendants' motion for summary judgment with respect to Plaintiffs' reckless investigation claims against Sheriff Ford and Dallas County, finds that Sheriff Ford is not entitled to qualified immunity on Plaintiffs' reckless investigation claims, and grants County Defendants' motion for summary judgment with respect to Plaintiffs' reckless investigation claims against Setterman (Dkt. No. 189);

13.     The Court grants State Police Defendants' motion for summary judgment with respect to Plaintiffs' reckless investigation claims (Dkt. No. 192);

14.     The Court grants Fordyce Defendants, County Defendants, and State Police Defendants' motions for summary judgment with respect to Plaintiffs' Fourth Amendment claims (Dkt. Nos. 184; 189; 192);

15.     The Court denies Fordyce Defendants, County Defendants, and State Police Defendants' motions for summary judgment with respect to Plaintiffs' 42 U.S.C. § 1983 conspiracy claims (Dkt. Nos. 184; 189; 192);

16.    The Court grants Fordyce Defendants, County Defendants, and State Police Defendants' motions for summary judgment with respect to state law malicious prosecution claims (Dkt. Nos. 184; 189; 192);

17.    The Court denies Fordyce Defendants, County Defendants, and State Police Defendants' motions for summary judgment with respect to Plaintiffs' state law civil conspiracy claims (Dkt. Nos. 184; 189; 192);

18.    The Court grants Fordyce Defendants' and State Police Defendants' motions for summary judgment with respect to Thompson's failure to intervene claims (Dkt. Nos. 184; 192).  The Court, on its own accord, dismisses Thompson's failure to intervene claims against County Defendants; and

19.    The Court denies Fordyce Defendants, County Defendants, and State Police Defendants' motions for summary judgment with respect to Thompson's intentional infliction of emotional distress claims (Dkt. Nos. 184; 189; 192). County Defendants and State Police Defendants are not entitled to statutory immunity on Thompson's intentional infliction of emotional distress claims.

It is so ordered this 25th day of September, 2025.

_Kristine G. Baker_
_____
Kristine G. Baker
Chief United States District Judge